# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

March 9, 2011

No. 10-30808
Summary Calendar

Lyle W. Cayce
Clerk

MARC NUNEZ,

Plaintiff – Appellant

v.

EDWARD ROBIN, SR.; EDWARD ROBIN, JR.; DON ROBIN, SR.; BRAD
ROBIN; ROBIN CAPITAL HOLDINGS, L.L.C.; PEARL SAND AND
GRAVEL, L.L.C.; SAND SPECIALTIES AND AGGREGATES, L.L.C.,

Defendants – Appellees

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:09-CV-5445

Before HIGGINBOTHAM, SMITH, and HAYNES, Circuit Judges.

PER CURIAM:[*]

Appellant Marc Nunez ("Nunez") challenges the district court's determination that his ownership interest in a joint venture was not an investment contract as defined by the Securities Exchange Act of 1934 ("SEA"), codified at 15 U.S.C. § 78a et seq. *See* 15 U.S.C. § 78c(a)(10). For the reasons set forth below, we AFFIRM the district court's grant of summary judgment.

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 10-30808

## I. Background

Mike Moncrief ("Moncrief"), a pilot for Federal Express, helped build a sand and gravel mining plant in Arkansas. From that experience, he developed a plan to build a sand and gravel mining facility and produce frac sand,[1] although he had never actually worked with frac sand. Moncrief began looking for partners to provide the necessary capital for the venture. Ultimately, Moncrief entered into a joint venture with Brad Robin, Don Robin, Sr., Edward Robin, Sr., Edward Robin, Jr. (collectively, the "Robins"), and Nunez. On June 5, 2008, they formed Sand Specialties and Aggregates, LLC ("SSA"), a limited liability company organized in Louisiana. By agreement, Nunez and each of the Robins were to receive a 10% membership of SSA in exchange for capitalizing the venture. Moncrief would receive a 50% membership interest in return for (1) his experience in constructing gravel plants; (2) the engineering technology to construct a gravel and frac sand plant; (3) the ultimate design and engineering for the plant to be used by the business; and (4) his technical experience to develop a strategy and business plan. Moncrief would also manage, build, and run the plant "for the first year or so."

On June 11, 2008, Nunez was named SSA's managing partner. In his capacity as managing partner, Nunez was given the authority to "execute all documents and do all things necessary and proper to sell, encumber, purchase, alienate or enter into any contracts whatsoever with (immovable) property owned by [SSA] and otherwise exercise all authority as Managing Partner."[2] In

---

[1] Frac sand is a specialty sand used by oil and gas companies to increase the productivity of wells.

[2] Nunez argues that Moncrief testified that he did not accept Nunez as the managing partner. Read in context, however, Moncrief testified that he thought Nunez *and* the Robins brothers were "all managing members." Thus, this testimony does not support the concept that Nunez was a mere passive investor only that Moncrief thought that more of the parties funding the enterprise were involved in its management than just Nunez.

his capacity as managing partner, Nunez signed every check paid out by SSA.[3] Nunez also signed numerous contracts on SSA's behalf, including the lease for the land upon which the gravel and sand facility was to be built. He was also SSA's registered agent.

Furthermore, Southern Services and Equipment, Inc. ("Southern Services"), a company owned and directed by Nunez and his wife, performed numerous financial and administrative services for SSA. These services included maintaining SSA's books and records, generating SSA's financial reports, receiving and possessing SSA's bills for payment, paying bills, setting up accounts, and generating SSA's business account records. Southern Services also was active in the construction of SSA's gravel and sand facility, helping to fabricate equipment for the facility.[4]

After some time, SSA began to have problems with capital. Furthermore, some disputes arose between the Robins and Nunez regarding the fees Southern Services was receiving from SSA. Nunez brought suit in federal court against the Robins; SSA; Robin Capital Holdings, LLC ("RCH"); and Pearl Sand and

---

[3] Pete Robin also had authority to sign checks for SSA, but never exercised that right. No other member of SSA, including Moncrief, had authority to sign checks for SSA.

[4] Nunez makes the somewhat bizarre argument that his work on behalf of Southern Services is in a "different capacity" than his work at SSA such that it "doesn't count" in the equation of whether or not his investment was an "investment contract." Nunez argues that under "entity theory" the court cannot attribute Southern Services's administrative role to him in his role as managing partner of SSA. Taken to its logical extreme, Nunez's argument would allow him to contend that his "other capacity" was actually the "indispensable" entrepreneur allowing his "SSA capacity" to then be the passive investor. Further, he points to no case that has applied "entity theory" in this context. Indeed, to do so would ignore this court's constant refrain that "economic realities govern over form" when determining whether an arrangement qualifies as a security. *Williamson*, 645 F.2d at 422. Moreover, were we to assume arguendo that the *actions* performed by Southern Services cannot be attributed to Nunez, his management of Southern Services would nonetheless establish that he has the requisite *knowledge and experience* to manage SSA's finances, which is all that *Williamson* and its progeny require. In any event, Nunez's reliance on himself in a different capacity, as well as other family members and Southern Services employees, does not raise a fact issue to show that Moncrief was "the indispensable person" upon whom the venture relied.

No. 10-30808

Gravel, LLC ("Pearl") (collectively, the "Securities Defendants"), alleging that the Robins fraudulently misrepresented that they could each contribute up to $800,000 to SSA in violation of section 10(b) of the SEA, codified at 28 U.S.C. § 78j(b), and Rule 10(b)-5, codified at 17 C.F.R. § 240.10b-5.[5]   The Securities Defendants filed a motion to dismiss for lack of jurisdiction, arguing that Nunez's ownership interest in SSA was not a security, therefore Nunez had no valid federal claims.  The district court denied the motion to dismiss and directed the parties to engage in limited discovery as to whether Nunez has an actionable securities claim under federal law.   Following discovery, the Securities Defendants moved for summary judgment, which the district court granted, dismissing Nunez's state claims without prejudice.  Nunez appeals this grant of summary judgment.

## II. Analysis

### A. Standard of Review

We review a district court's grant of summary judgment de novo, using the same legal standard as the district court.  *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007).  Summary judgment is appropriate where there is no genuine issue of material fact and the parties are entitled to judgment as a matter of law.  *Id.*  All reasonable inferences must be drawn in favor of the nonmovant, but "a party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." *Id.* (internal quotation marks omitted).

### B. Nunez's Federal Securities Claim

---

[5] Whether the Robins actually promised to contribute $800,000 each is a subject of dispute between the parties.  Because we resolve Nunez's federal securities claim on other grounds, we express no opinion as to this issue.  It is unclear on the face of the complaint and subsequent briefing what cause of action Nunez asserts against SSA, RCH and Pearl.

4

No. 10-30808

The primary question before the court is whether Nunez's ownership interest in SSA is an investment contract and therefore regulated under the SEA. *See* 15 U.S.C. § 78c(a)(10) (including "investment contract[s]" within the definition of securities covered by the SEA). An investment contract is a contract, transaction or scheme whereby (1) a person invests his money, (2) in a common enterprise, and (3) is led to expect profits solely from the efforts of the promoter or a third party. *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298-99 (1946); *Williamson v. Tucker*, 645 F.2d 404, 417 (5th Cir. 1981). The parties only contest the third prong.

"Although the Court used the word 'solely' in the *Howey* decision, it should not be interpreted in the most literal sense." *Williamson*, 645 F.2d at 418. Instead, courts read this requirement broadly "to ensure that the securities laws are not easily circumvented by agreements requiring a 'modicum of effort' on the part of investors." *Long v. Shultz Cattle Co.*, 881 F.2d 129, 133 (5th Cir. 1989). In this circuit, the critical inquiry is "whether 'the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise.'" *Youmans v. Simon*, 791 F.2d 341, 345 (5th Cir. 1986) (quoting *Williamson*, 645 F.2d at 418).

Because SSA is a joint venture, Nunez must overcome the "strong presumption" that "a general partnership or joint venture interest is not a security. A party seeking to prove the contrary must bear a heavy burden of proof." *Id.* at 346; *see also Williamson*, 645 F.2d at 421 ("[A] general partnership or joint venture interest generally cannot be an investment contract under the federal securities acts."). "The reason [joint venturers] are usually not covered under the securities laws is that they are entrepreneurs, not investors, and have the ability to take care of their own interests because of the inherent powers available to them." *Youmans*, 791 F.2d at 346. "Although general partners and joint venturers may not individually have decisive control over major decisions,

5

No. 10-30808

they do have the sort of influence which generally provides them with access to important information and protection against a dependence on others." *Williamson*, 645 F.2d at 422. Our court has therefore cautioned that "[a]n investor who is offered an interest in a general partnership or joint venture should be on notice . . . that his ownership rights are significant, and that the federal securities acts will not protect him from a mere failure to exercise his rights." *Id.*

On the other hand, "the mere fact that an investment takes the form of a general partnership or joint venture does not inevitably insulate it from the reach of federal securities laws." *Id.* Instead, "economic reality is to govern over form." *Id.* at 418. Whether a joint venture or general partnership interest constitutes a security depends on whether:

> (1) an agreement among the parties leaves so little power in the hands of the partner or venturer that the arrangement in fact distributes power as would a limited partnership; or
>
> (2) the partner or venturer is so inexperienced and unknowledgeable in business affairs that he is incapable of intelligently exercising his partnership or venture powers; or
>
> (3) the partner or venturer is so dependent on some unique entrepreneurial or managerial ability of the promoter or manager that he cannot replace the manager of the enterprise or otherwise exercise meaningful partnership or venture powers.

*Youmans*, 791 F.2d at 346.

Nunez does not argue that he lacked managerial power; instead, he argues that because he lacked experience in sand and gravel mining, he was forced to rely on Moncrief and was unable to intelligently exercise his managerial powers. At trial, Nunez would have the burden to establish that he was unable to exercise his managerial powers. *See Long*, 881 F.2d at 134 ("[A] plaintiff may establish reliance on others within the meaning of *Howey* if he can demonstrate

6

not simply that he did not exercise the powers he possessed, but that he was incapable of doing so.").

The district court correctly concluded that "[i]t is clear that Nunez could not by himself entirely control the course and scope of SSA's business." Moncrief brought technical expertise to SSA that its other members lacked. However, although we consider an investor's expertise "in relation to the nature of the underlying venture," *id.* at 135, Nunez, in response to the summary judgment motion, did not offer sufficient evidence showing that his reliance on Moncrief's technical expertise precluded him from exercising meaningful control over SSA's finances. *See Robinson v. Glynn*, 349 F.3d 166, 171 (4th Cir. 2003) ("In the end, [the plaintiff] generally asserts that he lacked technical sophistication, without explaining in any detail what was beyond his ken or why it left him powerless to exercise his management rights."). As the Fourth Circuit noted:

> [b]usiness ventures often find their genesis in the different contributions of diverse individuals—for instance, as here, where one contributes his technical expertise and another his capital and business acumen. Yet the securities laws do not extend to every person who lacks the specialized knowledge of his partners or colleagues, without a showing that this lack of knowledge prevents him from meaningfully controlling his investment.

*Id.* 171-72 (4th Cir. 2003); *cf. Williamson*, 645 F.2d at 423 ("The delegation of rights and duties—standing alone—does not give rise to the sort of dependence on others which underlies the third prong of the *Howey* test.").

Rather, the undisputed facts in this case establish that Nunez not only had the knowledge and expertise to exercise authority over SSA's finances, but also that he actively exercised that authority. He signed checks and contracts on behalf of SSA, and through Southern Services, managed nearly every aspect of SSA's finances. As discussed, Southern Services maintained SSA's books and records, generated SSA's financial reports, received and possessed SSA's bills for

7

payment, paid bills, set up accounts, and generated SSA's business account records. As Moncrief, who is not a party to this litigation, described the situation, "[Southern Services] administrated everything we did."

The record establishes that Nunez participated in other managerial decisions in his role as managing partner of SSA. For example, Moncrief's original plan called for SSA to contract the sand and gravel plant to a third party. Instead, Moncrief, Nunez, and Pete Robin decided that SSA should own and operate the plant internally. Similarly, Nunez participated in, and agreed to, the decision for SSA to seek a $250,000 loan. Nunez also called a meeting of SSA's members when SSA began to lack necessary capital. These are not the type of decisions that require a technical knowledge of gravel mining. These are, in their essence, financial decisions. Furthermore, Nunez's control of the finances was "undeniably significant." Those decisions which affect the failure or success of the enterprise include not only profit-making decisions, but also "the essential infrastructure of the venture." *Long*, 881 F.2d at 137.

These facts distinguish this case from *Long*. In *Long*, Shultz Cattle Company, Incorporated ("SCCI") entered into "consulting agreements" whereby investors would invest in cattle to take advantage of certain tax breaks available to cattle farmers. *Id*. at 130-31. Although the investors had "a substantial degree of theoretical control over the investment," *id*. at 134, the court found that agreements were investment contracts because it was undisputed that the investors, who had no relevant cattle farming experience, "acquired *from SCCI all* of the knowledge necessary to 'actively manage' their 'individual' cattle-feeding businesses." *id*. at 135 (some emphasis added); *see also Long v. Shultz Cattle Co. Inc.*, 896 F.2d 85, 87 (5th Cir. 1990) (denial of petition for rehearing) ("[The] investors here were business and professional people who resided in locales far removed from their nominally owned cattle, and who possessed neither the knowledge nor the desire to buy, raise and market cattle on an

individual basis."). Indeed, the court noted that SCCI's consulting agreements did not vary in practice from limited partnerships that it offered to other investors. *Long*, 881 F.2d at 136 ("SCCI performed for [the investors] . . . all of the services it performed for the limited partners in its other programs."). In this case, Nunez was not reliant on Moncrief for every decision relevant to his management of SSA. Southern Services, not Moncrief, provided Nunez, and all of SSA's members, with the relevant financial data. Furthermore, unlike the investors in *Long*, Nunez entered into a joint venture, which carries with it the presumption of active involvement, involvement he indisputably had. Nunez has therefore failed to prove that he lacked the knowledge and experience to meaningfully exercise his managerial powers at SSA.

Nunez also argues that he was reliant on Moncrief's unique knowledge of gravel and frac sand production. Nunez's control of SSA's finances does not preclude this argument because "[e]ven the most knowledgeable partner may be left with no meaningful option when there is no reasonable replacement for the investment's manager." *Williamson*, 645 F.2d at 423. To succeed on this prong, Nunez must show that Moncrief was "uniquely capable" or that SSA's members were so dependent on Moncrief that they were "incapable, within reasonable limits, of finding a replacement." *Id*. at 425.

However, as the district court noted, although Moncrief has left the venture, the gravel plant built by SSA is currently operating. Nunez argues that the fact that the plant is operating does not show Moncrief was replaceable because SSA has contracted management of the facility to another company and is not operating it internally. However, Nunez presents no evidence that the contracting out of the facility is not substantially equivalent to operating the plant internally. Indeed, the original business plan for SSA called for contracting out the gravel and sand mining facility. Furthermore, the plant is currently being managed by Buddy Breaux, who attended several of the

9

membership meetings of SSA and was known to Nunez and other SSA partners. The record therefore firmly establishes that Moncrief's role was not unique or irreplaceable. Nunez has failed to raise a material fact issue on the question of whether he was a mere "passive investor" under *Williamson*. *See id.* at 421 ("These factors critically distinguish the status of a general partner from that of the purchaser of an investment contract who in law as well as in fact is a 'passive' investor.").

## C. Nunez's state claims

Nunez also brings a number of state law claims against the Securities Defendants. The district court, having dismissed Nunez's only federal cause of action at the summary judgment stage, dismissed the state law claims without prejudice. Nunez has not challenged this aspect of the district court's decision on appeal.

## III. Conclusion

For the foregoing reasons, we AFFIRM the judgment of the district court.