## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 17-41022

United States Court of Appeals
Fifth Circuit

**FILED**
December 4, 2018

Lyle W. Cayce
Clerk

SECURITIES AND EXCHANGE COMMISSION,

> Plaintiff - Appellee

v.

SAMEER P. SETHI,

> Defendant - Appellant

Appeal from the United States District Court
for the Eastern District of Texas

Before STEWART, Chief Judge, and KING and OWEN, Circuit Judges.

CARL E. STEWART, Chief Judge:

Sameer P. Sethi sold interests in an oil and gas joint venture. He promised investors partnerships with world-famous oil companies and large returns. The SEC wasn't buying it—not only did Sethi fail to register his interests as securities, he materially misrepresented his relationships with large oil companies. The SEC filed claims against Sethi under Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), Rule 10b-5, 17 C.F.R. § 240.10b-5, and Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a). Then the SEC filed a motion for summary judgment. The district court granted the motion, holding that Sethi offered securities and committed securities fraud. Sethi appeals. We affirm.

No. 17-41022

I.

Sethi sold interests in an oil and gas drilling joint venture.  He sold these interests through his company, Sethi Petroleum, which he founded in 2003 and manages alone.   Sethi sought out investors using a broad cold-calling campaign.  With the help of twenty salespersons, he purchased lead lists and offered positions in his joint venture to potential investors.  When a potential investor expressed interest, Sethi would determine whether the investor was "accredited."   If so, he would further promote the venture using two main documents: a private placement memorandum ("PPM") and a copy of the joint venture agreement ("JVA").

The PPM told investors that Sethi intended to raise $10 million by selling fifty units at $200,000 apiece.  Sethi would then use the investor funds to purchase mineral interests in an oil and gas development in the Williston Basin in North Dakota, South Dakota, and Montana.   The PPM further specified that Sethi would use the funds to purchase a 62.5% net working interest in at least twenty wells, all of which would be operated "by publicly traded and/or major oil and gas companies," such as ExxonMobil, Hess Corporation, and ConocoPhillips.  The PPM also made clear that Sethi would not commingle venture funds with funds from "Sethi Petroleum or any Affiliate."

The JVA laid out the rights, duties, and obligations for the investors and the managing venturer—Sethi Petroleum.  While the JVA purported to give the investors control over the venture's affairs, it delegated power over the day-to-day operations to Sethi Petroleum.  The JVA also gave Sethi Petroleum the sole power to distribute profits, execute oil and gas agreements, hire professionals, and take and hold property.  The JVA required a majority vote of the investors for larger actions, such as acquiring oil and gas interests.

No. 17-41022

As a result of his sales efforts, Sethi ended up raising over $4 million from ninety investors, which he used to purchase a fractional working interest in eight wells from Irish Oil & Gas, with the interests ranging from 0.15% to 2.5%. Three different operators worked on the wells—Crescent Point Energy U.S. Corp., Oxy USA Inc., and Slawson Exploration Co. Six of the wells produced oil, and the operators voluntarily cancelled two other wells.

Over the course of the investments, no evidence shows that a vote or investor meeting ever occurred.

## II.

We review a district court's grant of summary judgment de novo, using the same legal standard as the district court. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007). Summary judgment is appropriate where there is no genuine issue of material fact and the parties are entitled to judgment as a matter of law. *Id.* All reasonable inferences must be drawn in favor of the nonmovant, but "a party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." *Id.* (internal quotation marks omitted).

## III.

On appeal, Sethi challenges two of the district court's decisions. First, he argues that the district court erred when it held that interests in his drilling projects qualified as securities. Second, he argues that the district court erred in granting summary judgment on the SEC's securities fraud claims.

### A.

Under Section 5 of the Securities Act, it is "unlawful for any person, directly or indirectly" to use interstate commerce to offer to sell "any security" unless the person has filed a "registration statement" for the security. 15 U.S.C. § 77e(c). The Securities Act broadly defines the term security to include a long list of financial instruments, including "investment contracts," the type

3

No. 17-41022

of security at issue here. *See* 15 U.S.C. § 77b. While Congress defined the term "security," it left it to the courts to define the term "investment contract." In *Howey*, the Supreme Court developed a "flexible" test for determining whether an arrangement qualifies as an investment contract:

> [A]n investment contract for purposes of the Securities Act means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party.

*SEC v. W.J. Howey Co.*, 328 U.S. 293, 298-99 (1946). Distilled to its elements, an investment contract qualifies as a security if it meets three requirements: "(1) an investment of money; (2) in a common enterprise; and (3) on an expectation of profits to be derived solely from the efforts of individuals other than the investor." *Williamson v. Tucker*, 645 F.2d 404, 417-18 (5th Cir. 1981) (citing *SEC v. Koskot Interplanetary, Inc.*, 497 F.2d 473 (5th Cir. 1974)). Here, the parties dispute the third factor.

When determining whether investors expect to rely "solely on the efforts of others," courts construe the term "solely" "in a flexible manner, not in a literal sense." *Youmans v. Simon*, 791 F.2d 341, 345 (5th Cir. 1986). Courts read this requirement flexibly "to ensure that the securities laws are not easily circumvented by agreements requiring a 'modicum of effort' on the part of investors." *Long v. Shultz Cattle Co.*, 881 F.2d 129, 133 (5th Cir. 1989). The critical inquiry is whether "the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise." *Williamson*, 645 F.2d at 418 (internal citation omitted). Even though an investor might retain "substantial theoretical control," courts look beyond formalities and examine whether investors, in fact, can and do utilize their powers. *Affco Invs. 2001, LLC v. Proskauer Rose, LLP*, 625 F.3d 185, 190 (5th Cir. 2010).

4

No. 17-41022

Here, the court must apply these general principles to a partnership.[1] While we employ a "strong presumption" that "a general partnership . . . is not a security," *Nunez v. Robin*, 415 F. App'x 586, 589 (5th Cir. 2011) (per curiam) (unpublished) (quoting *Youmans*, 791 F.2d at 344), this court in *Williamson* articulated three factors that, if proven, overcome this presumption. These factors flesh out situations where investors depend on a third-party manager for their investment's success, and each factor is sufficient to satisfy the third *Howey* factor. Under the *Williamson* factors, a partner is dependent solely on the efforts of a third-party manager when:

> (1) an agreement among the parties leaves so little power in the hands of the partner or venturer that the arrangement in fact distributes power as would a limited partnership; or (2) the partner or venturer is so inexperienced and unknowledgeable in business affairs that he is incapable of intelligently exercising his partnership or venture powers; or (3) the partner or venturer is so dependent on some unique entrepreneurial or managerial ability of the promoter or manager that he cannot replace the manager of the enterprise or otherwise exercise meaningful partnership or venture powers.

*Williamson*, 645 F.2d at 422.[2] Courts, however, are not limited to these three factors—other factors could "also give rise to such a dependence on the promoter or manager that the exercise of partnership powers would be

---

[1] This court applies the same analysis to partnerships and joint ventures. *Youmans*, 791 F.2d at 346 n.2 ("Our discussion of partnerships applies with equal force to joint ventures since this kind of business investment device is the same for purposes of the federal securities laws.").

[2] A number of other circuits have adopted the *Williamson* factors as a way to analyze the third *Howey* factor. *See, e.g.*, *SEC v. Shields*, 744 F.3d 633, 644 (10th Cir. 2014) (adopting the *Williamson* factors); *United States v. Leonard*, 529 F.3d 83, 90-91 (2d Cir. 2008) (same); *SEC v. Merch. Capital, LLC*, 483 F.3d 747, 755-66 (11th Cir. 2007) (same); *Stone v. Kirk*, 8 F.3d 1079, 1086 (6th Cir. 1993) (same); *Koch v. Hankins*, 928 F.2d 1471, 1477-81 (9th Cir. 1991) (same); *Rivanna Trawlers Unlimited v. Thompson Trawlers, Inc.*, 840 F.2d 236, 241 (4th Cir. 1988) (same).

effectively precluded." *Id.* But regardless of which factor is at issue, a party can only prove one of the *Williamson* factors by looking to the unique facts of the arrangement at issue. Differently put, a party faces a "factual burden" when proving one of the *Williamson* factors. *Id.* at 425.

The first *Williamson* factor is whether the drilling projects left the investors so little power "that the arrangement in fact distribute[d] power as would a limited partnership." *Id.* at 422. In determining whether an arrangement deprives investors of power, courts look to two sources of evidence. First, courts look to the legal documents setting up the arrangement to see if investors were given formal powers. *See, e.g.*, *id.* at 424 (looking to the "partnership agreement" to see if partners were given power). Second, courts examine how the arrangement functioned in practice. How the arrangement functioned is typically the most important indication of whether investors had power.[3] *See, e.g.*, *Nunez*, 415 F. App'x at 590 (looking to the fact that an investor exercised power over the partnership's finances); *Long*, 881 F.2d at 134 (crediting the jury's conclusion that investors, in practice, followed the manager's recommendations).

Here, the governing venture documents gave investors some theoretical power to control the drilling projects. Importantly, they had the power to remove Sethi as manager. *See Youmans*, 791 F.2d at 347 (holding that the

---

[3] Post-investment conduct is relevant for determining the expectations of the parties at the time they entered the drilling investment contracts, as other circuits have held. *Shields*, 744 F.3d at 646; *see also Merch. Capital, LLC*, 483 F.3d at 760; *Koch*, 928 F.2d at 1478 (looking to the "practical possibility of the investors exercising the powers they possessed pursuant to the partnership agreements."). Although the Fifth Circuit has not explicitly held that courts may look to post-investment activity, nearly every case has in fact analyzed such activity. *See, e.g.*, *Nunez*, 415 F. App'x at 590 (looking to the fact that the investor exercised power over the partnership's finances); *Long*, 881 F.2d at 134 (crediting the jury's conclusion that investors followed the manager's recommendations); *Youmans*, 791 F.2d at 347 (directing the trial court on remand to further develop the "practical application" of the relevant contract provisions).

removal power is "an essential attribute of a general partner's . . . authority."). They also could call meetings and propose amendments with a 20% vote, develop rules for meetings with a 50% vote, and veto Sethi's decisions.

These powers, however, were illusory in practice. Sethi blocked investors from using their powers on numerous occasions. First, and most tellingly, Sethi was responsible for calling meetings and soliciting votes. He never did. The investors never held a meeting and did not vote on any matter. A receiver appointed by the district court also found no evidence that Sethi ever "organized a vote or solicited input of any kind from investors." While Sethi contends that the project was in its early stages, the SEC provided evidence that Sethi took several actions without informing investors. When he purchased well interests for the venture, he did not inform the investors or solicit any investor approval, even though this approval was required by the JVA. He did not notify investors when he sued to rescind this interest. Nor did Sethi ask for any investor input when he drilled eight of twenty wells promised in the PPM.

Second, Sethi gave the investors little to no information. The investors did not have access to the project's books. One investor, Michael Martin, declared that Sethi's employees stymied his efforts to gather information on numerous occasions, denying him promised "up-to-date" reports and repeatedly failing to return his calls and emails. Other investors corroborated Martin's story, declaring that Sethi "never consulted" them on "business matters" and failed to provide "promised quarterly updates." The district court's receiver further supported this evidence, concluding that Sethi "actively sought to minimize transparency with investors and limit the information to be made available to, and the involvement of, the investors." Without "sufficient information," investors could not "make meaningful decisions" about their investments. *Merch. Capital*, 483 F.3d at 759.

No. 17-41022

Sethi does not provide any evidence to the contrary.  He correctly states the law in arguing that a voluntarily passive investor cannot transform an investment into a security.  *See Rivanna Trawlers Unlimited*, 840 F.2d at 240-41.  Sethi did not, however, support this argument with any evidence.  Meanwhile, the SEC provided summary judgment evidence that investors did seek to use their powers but could not.  Sethi also argues—again without evidence—that investors might have been actively monitoring their investments.  But overcoming a motion for summary judgment requires Sethi to do more than provide "unsubstantiated assertions." *Turner*, 476 F.3d at 343.

In sum, the SEC provided unrebutted evidence showing that the investors could not use their legal powers.  As a result, the district court correctly concluded that Sethi's drilling projects distributed power as if they were limited partnerships.  Because we agree that the first *Williamson* factor was met, we do not address the second and third factors.

B.

Sethi also argues that the district court erred when it granted the SEC's motion for summary judgment on its securities fraud claims under Section 10(b) of the Exchange Act, Rule 10b-5, and Section 17(a) of the Securities Act.

Section 10(b) of the Exchange Act makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b).  Under the power granted by this statute, the SEC created Rule 10b-5, which makes it unlawful for any person, directly or indirectly:

    (a) To employ any device, scheme, or artifice to defraud,

    (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements

8

made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person

17 C.F.R. § 240.10b-5.

To prove a violation of Rule 10b-5[4] for material representations or misleading omissions, the SEC must prove three elements: "(1) material misrepresentations or materially misleading omissions, (2) in connection with the purchase or sale of securities, (3) made with scienter." *SEC v. Seghers*, 298 F. App'x 319, 327 (5th Cir. 2008) (unpublished) (per curiam) (citing *Aaron v. SEC*, 446 U.S. 680, 695 (1980)). To show that a defendant has violated § 17(a)(2) or (a)(3), the SEC must show the same elements as for Rule 10b-5, except that it need only prove "the defendant acted with negligence." *Id.*

Here, the parties dispute the first and third elements of this test, material misrepresentation and scienter. Under Rule 10b-5, a defendant makes a misrepresentation when "the information disclosed, understood as a whole, would mislead a reasonable potential investor." *Laird v. Integrated Recs., Inc.*, 897 F.2d 826, 832 (5th Cir. 1990). The scope of this standard is determined by the relative status and sophistication of the parties. *Id.* The defendant's misrepresentation is material "if there is a substantial likelihood that a reasonable investor would consider the information important in making a decision to invest." *ABC Arbitrage Plaintiffs Grp. v. Tchuruk*, 291 F.3d 336, 359 (5th Cir. 2002). To prove scienter, the SEC need only prove that the defendant acted with severe recklessness. *Broad v. Rockwell Int'l Corp.*, 642 F.2d 929, 961 (5th Cir. 1981) (en banc). Severe recklessness is defined as "those highly unreasonable omissions or misrepresentations that involve not

---

[4] The scope of liability under Section 10(b) and Rule 10b–5 is the same. *See SEC v. Zandford*, 535 U.S. 813, 816 n.1 (2002).

merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Id.* at 961-62.

Sethi primarily argues that he did not make any misrepresentations at all. He also suggests that he did not act with scienter. We are not persuaded. Sethi's brief cites no summary judgment evidence to support his conclusory arguments. Meanwhile, the district court, relying on unrebutted evidence, held that Sethi misstated his relationships with major oil companies when offering interests in his drilling venture and, as a result, misled investors. The record supports the district court's findings.

In communications with prospective investors, Sethi and his employees made several statements concerning his relationships with major oil companies. His cold-call script emphasized the venture's current relationship with "HUGE, PUBLICLY traded companies, like Conoco Phillips, Continental, GMXR just to name a few." The script also claimed that the venture was "working DIRECTLY with these major companies." Affidavits confirm this evidence. One investor declared that Sethi told him that "Sethi Petroleum was partnering with Exxon Mobil and other major oil companies to drill and operate." A former cold-caller also declared that Sethi instructed him to emphasize Sethi Petroleum's relationships with "major oil and gas companies."

Sethi did not stop these representations after the initial call—the offering documents also portrayed Sethi Petroleum as having current partnerships with several major oil and gas companies. The Executive Summary represented that "all" of the venture's wells would be drilled by "Exxon Mobil (XOM), Conoco Phillips (COP), Continental Resources (CLR), Hess Corp. (HES), and several others, all of whom have extensive drilling experience in the Williston Basin." The PPM told investors that "publicly

traded and/or major oil and gas companies" would drill the venture's wells. The PPM also specifically mentioned the four companies listed above as examples of the type of company that would drill the venture's wells.

Taken together, Sethi's statements suggest that Sethi Petroleum had preexisting relationships with some of the largest oil companies in the world— relationships that Sethi would leverage in the venture's favor. In reality, these relationships did not exist. No evidence in the record indicates that Sethi Petroleum had any preexisting relationship with any of the listed companies or ones that are similar. Nor does the record show that the venture ever partnered with Exxon Mobil, Conoco Phillips, or a similar company. In fact, Sethi acquired the venture's only well interests from Irish Oil & Gas, Inc.—a small, private oil company. Three other companies—Crescent Point Energy U.S. Corp., Slawson Exploration Co., and Oxy USA Inc.—operated the wells. Sethi does not point us to any contrary evidence. Sethi also offers no evidence that either Crescent Point Energy or Slawson Exploration are of the same scale and notoriety as the major oil companies touted in the offering documents. And while Oxy USA is a subsidiary of Occidental Petroleum, a major oil company, Sethi offers no evidence about whether and to what extent Occidental Petroleum was involved in the well operation. Nor does he present any evidence of a preexisting relationship with Oxy USA or Occidental Petroleum. The district court correctly concluded that these facts constitute a misstatement.

These facts also establish scienter. Sethi knew that he did not have relationships with the listed companies, and Sethi does not dispute that the venture never partnered with a major oil company.[5] Nevertheless, he

---

[5] Sethi contends that he relied on consultants when he made these statements and, therefore, did not act with scienter. Again, however, he provides no evidence to support his argument. Nowhere in the record do we find any sign that Sethi relied on statements by his

repeatedly represented that he had relationships with several major oil companies, and he used these representations as a tool to entice investors. By touting his relationships with major oil companies, Sethi created a "danger of misleading buyers" into believing that his venture would be well-managed and their investments would be in the hands of the most successful drillers in the world. *Broad*, 642 F.2d at 961.

In sum, the district court correctly found that Sethi made material misstatements to investors when he knowingly misrepresented his relationships with major oil companies.

IV.

For the foregoing reasons, the judgment of the district court is AFFIRMED.

---

consultants, or that consultants ever made statements about Sethi Petroleum's relationships with major oil companies.