# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

October 12, 2021

Lyle W. Cayce
Clerk

No. 20-30464

Securities and Exchange Commission,

*Plaintiff—Appellee*,

*versus*

Ronald L. Blackburn; Bruce A. Gwyn; Michael A. Mulshine,

*Defendants—Appellants*.

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:15-CV-2451

Before Dennis, Higginson, and Costa, *Circuit Judges*.

Gregg Costa, *Circuit Judge*:

The Securities and Exchange Commission charged these three defendants and others with selling unregistered securities and misleading investors during their operation of a penny stock company. On summary judgment, the district court found the three defendants liable on several of the Commission's claims. Among other remedies, the district court ordered disgorgement of the defendants' fraud proceeds.

This appeal presents two questions. First, was summary judgment warranted in the SEC's favor on liability? Second, was the disgorgement

No. 20-30464

award "for the benefit of investors" as *Liu v. SEC*, 140 S. Ct. 1936, 1949 (2020), requires?  This is the first time a court of appeals is being asked to decide the "awarded for victims" question since *Liu* was decided.  Because the answer to both questions is yes, we AFFIRM.

## I.

Ronald Blackburn founded Treaty Energy Corporation in 2008. Treaty was a small oil and gas company whose shares were traded over the counter as "penny stocks."  17 C.F.R. § 240.3a51–1 (defining penny stocks); *see SEC v. Kahlon*, 873 F.3d 500, 502 n.1 (5th Cir. 2017) (explaining that a "penny stock" is one sold over the counter for less than $5/share).  When the company was formed, Blackburn received around 400 million shares, giving him an 86.4% interest in Treaty.  Though Blackburn was never a board member or an officer of Treaty—we will soon discuss the reasons he may not have wanted those public affiliations—he maintained significant control over the company.  To cite some examples, Blackburn communicated with a foreign government on behalf of Treaty, paid the company's bills with his stock proceeds, and appointed Treaty's officers and directors.

Treaty was not Blackburn's first involvement with a penny stock company.  He had previously worked at a gravel pit company that went bankrupt.  During the bankruptcy, Blackburn paid over $1 million to settle the trustee's claim that he had misappropriated company funds.  And before that penny stock bankruptcy, Blackburn was convicted of four federal tax felonies.

Blackburn recruited people with cleaner records to serve as officers of his new Treaty venture.  Blackburn knew Michael Mulshine from before he started Treaty and asked him to help form the new company.  In exchange for his help, Mulshine received over 16 million shares of Treaty.  From then on, Mulshine served as Treaty's Assistant Secretary.

Bruce Gwyn's involvement with Treaty began a few years later when he joined the Board of Directors. He also served as Treaty's co-Chief Executive Officer for some time before becoming Treaty's Chief Operating Officer.

In 2014, the SEC asserted several claims against Treaty and individuals involved with Treaty, including Blackburn, Mulshine, and Gwyn.[1] To give a taste of the allegations, we detail a few here.

The SEC alleged that the defendants failed to register millions of shares they sold, in violation of sections 5(a) and 5(c) of the Securities Act. 15 U.S.C. § 77e(a), (c). These sales raised millions of dollars from unsophisticated investors.

The SEC also claimed that Blackburn and Mulshine misrepresented the company's drilling results to investors. *See* 15 U.S.C. § 77q(a); 17 C.F.R. § 240.10b-5. In 2012, Mulshine published a press release stating that Treaty had "struck oil" in Belize. The very next day, Belize's government released a statement "categorically refut[ing]" Treaty's claims of "drilling success" and calling the reports "false and misleading." An unchastened Mulshine, with Blackburn's help, published a second press release entitled, "Treaty Energy Provides Confirmation of its Belize Oil Find." Treaty never produced any oil in Belize.

The SEC further alleged that Mulshine deceived investors about Blackburn's role in Treaty. When Mulshine was searching for investors, he reached out to a former coworker named Jeffrey Morgan. In their discussions about the company, Morgan asked whether Blackburn was involved. If he

---

[1] The company and one defendant settled with the SEC. The district court found the other two defendants liable and imposed remedies against them in the same order we are reviewing, but those two defendants did not appeal.

was, Morgan did not want to invest—he had lost over $450,000 investing in the gravel pit company after Blackburn had guaranteed it had a "positive outlook." Despite Blackburn's significant control over Treaty, Mulshine assured Morgan that Blackburn was not involved. Morgan subsequently invested and lost about $20,000 this time.

The SEC similarly alleged that Gwyn failed to disclose in public filings Blackburn's involvement with Treaty. Gwyn prepared a Form 10-K on behalf of Treaty that listed and described Treaty's officers, directors, and significant employees. But Gwyn failed to name Blackburn. Instead of mentioning Blackburn by name throughout the rest of the filing, Gwyn referred to him in general, nonspecific terms—as a "major shareholder," an "affiliate," and a "related party." The 10-K thus did not reveal that Blackburn was controlling Treaty behind the scenes.

Both the SEC and defendants sought summary judgment. The court denied the defense motion and granted the Commission's motion in part.[2] The court concluded that defendants violated section 5 of the Securities Act by selling unregistered securities. The court also held that defendants violated section 10(b) of the Securities Exchange Act, rule 10b-5 thereunder, and section 17(a) of the Securities Act by misrepresenting Treaty's oil production and Blackburn's role in the company. The district court imposed several nonmonetary remedies, including prohibiting defendants from acting as officers or directors of any publicly held companies. The district court then ordered disgorgement of profits and imposed civil monetary penalties.

---

[2] The court denied the SEC's claim that defendants violated federal securities laws in connection with an offering for a West Texas project. The court also rejected the Commission's allegation that Blackburn and Mulshine aided and abetted Treaty's reporting violations.

Defendants appealed. The SEC requested a limited remand in light of the Supreme Court's decision in *Liu*, which had been decided after the district court's disgorgement order. We granted the limited remand, after which the district court modified its disgorgement procedure. Defendants now appeal the district court's summary judgment ruling and the amended disgorgement order.

## II.

We start with liability. In Blackburn's and Mulshine's joint briefing, they argue summary judgment was improper because "numerous" disputed fact issues exist. Yet their brief fails to identify any disputed issues; nor does it sufficiently challenge the court's analysis finding them liable based on undisputed facts. Instead their brief attacks the SEC. It blames the agency for overreliance on the victim who complained and on "professional internet bashers who were destroying Treaty on behalf of unknown naked-short sellers." The brief further chastises the SEC for the number of "venomous" press releases it issued about this case—claiming an "irresistible inference" that the press releases were not written by the SEC at all, but instead by an anonymous internet poster. The experienced district judge labeled these accusations "nonsensical." To the extent we can even understand these arguments, they in no way challenge the district court's thorough evaluation of the record, which led to its grant of summary judgment in the SEC's favor. Given the absence of meaningful engagement with that analysis, the district court's ruling must be upheld for these two defendants.

Gwyn challenges the district court's ruling that he violated Rule 10b-5 by failing to disclose, in required public filings, Blackburn's role with

Treaty.[3]  He argues there is a disputed fact issue on whether he had the requisite scienter in omitting Blackburn from the Form 10-K.  According to Gwyn, there is no evidence he was aware of Blackburn's criminal history when he filed the 10-K yet that criminal history is part of why the district court concluded the failure to disclose Blackburn's involvement was material.

But failing to disclose Blackburn's involvement was not material only if Gwyn knew of Blackburn's criminal history.  At a more basic level, it was material because Blackburn was running Treaty.  Investors make decisions about whether to invest their money in a company, in part, based on the company's leadership.  Even though Blackburn was not an officer of Treaty, there is "little doubt that a reasonable investor would have wanted to know the true identity" of who was leading the company.  *SEC v. Husain*, 2017 WL 810269, at *8 (C.D. Cal. Mar. 1, 2017) ("Other than a corporation's financials, its leadership . . . would seem to be [among] *the most* important pieces of information available to an investor."); *SEC  v. Farmer*, 2015 WL 5838867, at *9 (S.D. Tex. Oct. 7, 2015) (finding this information important "given the ease and frequency with which microcap companies . . . can and are manipulated by undisclosed control persons"); *see generally SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 849 (2d Cir. 1968) (en banc) (explaining that material facts include those "which affect the probable future of the company and those which may affect the desire of investors to buy, sell, or hold the company's securities").  Disclosure of Blackburn's key role with Treaty

---

[3] To establish liability under Rule 10(b)(5), the SEC must prove that the defendant made "an untrue statement of material fact or omit[ted] a material fact" and did so with an "'intent to deceive, manipulate or defraud'" or "'severe recklessness'" such that the "'danger of misleading buyers or sellers . . . is either known to the defendant or is so obvious that the defendant must have been aware of it.'" *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 366 (5th Cir. 2004) (citation omitted).

might have mattered to investors for a number of reasons, including but not limited to his criminal convictions, the lawsuit he settled for misappropriating over a million dollars from another company, or just his general reputation—good, bad, or nonexistent—in the oil-and-gas industry.

Gwyn was fully aware of Blackburn's wide-ranging management of Treaty and of the Form 10-K's disclosure requirements. He repeatedly referred to Blackburn's role in the 10-K but used "major shareholder," "affiliate," and "related party" instead of the proper noun. On these undisputed facts, Gwyn's failure to list Blackburn's name in the disclosure was—at the very least—severely reckless, such that the "danger of misleading" investors about Treaty's leadership was "so obvious that [Gwyn] must have been aware of it." *See Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 366 (5th Cir. 2004).

Although Gwyn is correct that summary judgment is uncommon on a question of intent, it is appropriate when the undisputed evidence removes any doubt on that issue. *See SEC v. Sethi*, 910 F.3d 198, 206–07 (5th Cir. 2018). That is the case here. Gwyn undeniably knew about Blackburn's paramount role in Treaty yet failed to disclose his name in the Form 10-K. Summary judgment is warranted on this claim.

### III.

Next is the challenge to the disgorgement remedy. The Exchange Act authorizes the SEC to seek "equitable relief" that "may be appropriate or necessary for the benefit of investors." 15 U.S.C. § 78u(d)(5). The Supreme Court recently addressed whether this statute supports the longstanding practice of ordering disgorgement in securities cases. *Liu*, 140 S. Ct. at 1940.[4]

---

[4] A few months after the Supreme Court decided *Liu*, Congress amended the Exchange Act to add a statutory subsection specifically authorizing disgorgement without

The Court answered yes, noting that "equity practice long authorized courts to strip wrongdoers of their ill-gotten gains." *Id.* at 1942. Two things keep such a remedy aimed at unjust enrichment from becoming punitive: Disgorgement cannot exceed the defendants' "net profits" and must "be awarded for victims." *Id.*

The district court's disgorgement order satisfies those requirements. First, the disgorgement amounts are the profits defendants received from their securities fraud: $1,512,059.96 for Blackburn, $108,291.05 for Mulshine, and $772,434.90 for Gwyn. As those figures show, the district court did not impose joint-and-several liability but individually assessed each defendant's gain. *See id.* at 1945, 1949 (raising concerns about joint-and-several disgorgement awards).

Second, the district court concluded that the SEC has identified the victims and created a process for the return of disgorged funds. Under the district court's supervision, any funds recovered will go to the SEC, acting as a de facto trustee. The SEC will then disburse those funds to victims but only after district court approval.

The disgorgement thus is being "awarded for victims." 140 S. Ct. at 1942. In contrast to a crime like insider trading—which injures the market as

---

the "for the benefit of investors" language. *See* 15 U.S.C. § 78u(d)(7) ("In any action or proceeding brought by the Commission under any provision of the securities laws, the Commission may seek, and any Federal court may order, disgorgement."); *see also* 15 U.S.C. § 78u(d)(3)(A)(ii). The SEC argues in the alternative that the amended law applies to this case that was pending when it was enacted and gives district courts broader authority to order disgorgement than the general "equitable relief" provision of section 78u(d)(5) that *Liu* interpreted. But we need not address this argument. As we discuss, the scheme set up by the district court is sufficient under the "equitable relief" provision the district court applied.

No. 20-30464

a whole rather than individual market participants[5]—defendants' fraud harmed identifiable investors. Because the SEC has already identified the defrauded Treaty investors, it is certainly feasible—more than that, it is the plan—that money the defendants return will go to the harmed investors.

This case therefore does not involve the issue *Liu* left open: whether disgorgement is "awarded for victims" when the money is put into a Treasury fund that helps "pay whistleblowers reporting securities fraud and to fund the activities of the Inspector General." *Id.* at 1947.[6] That issue arises when it is "infeasible to distribute the collected funds to investors." *Id.* at 1948. Here it is not only feasible to identify the victims to whom the funds will be distributed, that work has already been done.

The district court's order—requiring disbursements to already-identified victims with court supervision to ensure compliance with that edict—easily satisfies *Liu.*[7] We do not hold that this scheme is the only way to satisfy *Liu* as other cases may present greater challenges for ensuring that disgorgement benefits victims. Whatever the floor may be for *Liu* compliance, the remedy here rises well above it.

\* \* \*

The judgment is AFFIRMED.

---

[5] In at least one post-*Liu* insider trading case, the SEC withdrew its request for disgorgement. *See e.g.*, *SEC v. Govender*, 2020 WL 5758997, at \*1–2 (S.D.N.Y. Sept. 28, 2020).

[6] The district court initially ordered the disgorged funds to go into that Treasury fund but changed the plan following the limited remand.

[7] Defendants also challenge the district court's award of civil monetary penalties. They argue that because the penalty amounts were determined from the disgorgement amounts, the penalties should be vacated if the disgorgement award was in error. As we find no abuse of discretion on the court's disgorgement award, the penalties also stand.