# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 17-10503

United States Court of Appeals
Fifth Circuit

**FILED**
June 27, 2019

Lyle W. Cayce
Clerk

SECURITIES AND EXCHANGE COMMISSION,

      Plaintiff - Appellee

v.

ARCTURUS CORPORATION; ASCHERE ENERGY, L.L.C.; LEON ALI PARVIZIAN, also known as Alex Parvizian; ROBERT J. BALUNAS; R. THOMAS & CO., L.L.C.; ALFREDO GONZALEZ; AMG ENERGY, L.L.C.,

      Defendants - Appellants

---

Appeals from the United States District Court
for the Northern District of Texas

---

Before STEWART, Chief Judge, and DENNIS and WILLETT, Circuit Judges.
CARL E. STEWART, Chief Judge:

IT IS ORDERED that our prior panel opinion, *Securities and Exchange Commission v. Arcturus Corporation*, 912 F.3d 786 (5th Cir. 2019), is WITHDRAWN and the following opinion is SUBSTITUTED therefor.

The Defendants—Leon Ali Parvizian, Alfredo Gonzalez, Robert J. Balunus, Arcturus Corp., Aschere Energy, LLC, R. Thomas & Co., LLC, and AMG Energy, LLC—sold interests in several oil and gas drilling projects to investors. They never registered the interests as securities. The SEC called foul and filed this civil enforcement action. Because the Defendants failed to register interests in their drilling projects as securities, the SEC alleged that

No. 17-10503

they violated Sections 10(b) and 15(a) of the Securities Exchange Act ("Exchange Act"), 15 U.S.C. §§ 78j(b), 78o(a), Rule 10b-5, 17 C.F.R. § 240.10b-5, and Sections 5(a), 5(c), and 17(a) of the Securities Act ("Securities Act"), 15 U.S.C. §§ 77e(a), 77e(c), 77q(a). After roughly a year and a half of discovery, both parties filed motions for summary judgment. The district court granted the SEC's motion, holding that the oil and gas interests qualified as securities. The Defendants now appeal. Because the Defendants raised significant issues of material fact, we reverse the district court's decision and remand for trial.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A. FACTUAL BACKGROUND

This case involves seven defendants, three individuals—Leon Ali Parvizian, Alfredo Gonzalez, and Robert J. Balunus—and four companies—Arcturus Corp., Aschere Energy, LLC, R. Thomas & Co., LLC, and AMG Energy, LLC. Parvizian started three of the companies—Arcturus, Aschere, and AMG. He was also primarily responsible for running Arcturus and Aschere. Parvizian also founded AMG, but passed management on to Gonzalez, who has served as president since 2010. Balunus started and managed R. Thomas.

The Defendants offered and sold interests in six oil and gas drilling projects—Hillock, Piwonka, Conlee, Fraley-Nelson, Chips, and Wied Field. Each project had a managing venturer that supervised and managed the day-to-day operations. The managing venturer also earned management fees paid by the project. Together, Arcturus and Aschere were the managing venturers of all six projects—Arcturus managed four, and Aschere managed two. (We refer to Arcturus and Aschere, collectively, as the "Managers.")

While Arcturus and Aschere managed the drilling projects, R. Thomas and AMG were primarily responsible for marketing and selling interests in the

2

No. 17-10503

projects.  Neither company controlled or operated the drilling projects beyond marketing, and neither company registered as a broker.

R. Thomas entered into a consulting agreement with Aschere.  Under the agreement, R. Thomas earned a 12% commission on each new investor it introduced to the drilling projects.[1]  AMG had a similar consulting agreement with Aschere, under which it offered and sold interests in all six joint ventures in exchange for $500 per week for each AMG employee and a 12% commission on each venture unit sold.

### 1. The Sales Process

When the Defendants were selling interests in the drilling projects, they sought investors through a nationwide cold-calling campaign from 2007 to 2011.[2]  Potential investors came from a lead list that Parvizian purchased.[3] The Defendants also called previous investors about the drilling projects.

The record indicates that the full cold-call process involved multiple conversations and multiple calls.  (According to Alfredo Gonzalez, a former Amerest salesperson, the process "might take 5 phone calls or it might take 15 phone calls.")  In the initial call, the salesperson would give a "short and sweet"

---

[1] We refer to the joint venturers as "investors."  This is only for convenience and does not reflect a legal judgment.

[2] The majority of the information about the cold-call process came from SEC investigative interviews.  The SEC took these interviews before filing its lawsuit in 2013.

[3] There is little evidence about the lead list in the record, but several individuals made statements about the lead list in SEC investigative interviews.  Robert Balunas, a former salesperson at Amerest Securities, a company that contacted potential investors for Arcturus, stated that he had prior knowledge of and relationships with some of the investors his company sent to Arcturus.  He did not know anything about the lead lists used by Parvizian. He did state, however, that he only made offers to accredited investors.

According to another person, the list might have included only accredited investors. He also suggested that salespeople called both new and current clients.  Parvizian stated that AMG Energy may have provided him with the lead list, but he was unsure.

statement, introducing himself and noting that he works for "a firm involved in [sic] oil and gas exploration."  The salesperson would then ask if the prospective investor had experience in oil and gas investing.  If the investor did, the salesperson would ask if the prospective investor was interested in information about a potential investment opportunity.  If so, the salesperson would transfer the prospective investor to a "registered broker."[4]  Or if the salesperson was also a registered broker, then he would continue speaking with the prospective investor.  If the prospective investor expressed further interest to the broker, the broker would have a receptionist send out information.

Initially, Arcturus would send a one-page introduction letter, giving basic information about the company and ways to seek out additional information.[5]  This letter did not include any other materials.  This process was designed to form a "substantive relationship" with the new client.  If the new client expressed interest after additional calls, then Arcturus would send out a group of signing documents.  The Defendants distributed five primary signing documents: (1) a Confidential Information Memorandum ("CIM"), which gave a detailed overview of the drilling project; (2) a copy of the Joint Venture Agreement ("JVA"), which laid out the contractual rights and duties of each party; (3) a screening questionnaire, which asked various questions about the investor's education, investing history, and experience; (4) a Private

---

[4] Brokers could not communicate with potential investors in any other way.  For example, they did not have access to email.

[5] Brian William Bull, the former chief compliance officer for Amerest Securities, suggested that existing clients might not receive this introduction letter.  It is unclear how many existing clients Arcturus had.  Bull did state, however, that "many" investors "had been clients for years."  It is unclear whether these investors were clients of Amerest, Arcturus, or both.  But at least some of the eventual investors had been Parvizian's clients for years.

No. 17-10503

Placement Memorandum ("PPM"), which was an advertising brochure for each drilling project with geological information, pricing, and potential returns; and (5) a subscription agreement, which served as the investor's application. After sending these documents, a broker would make a follow-up call to ensure the materials arrived and were all in order.

If the prospective investor decided to invest, then he would fill out "paperwork that was included" in the materials, including the questionnaire. Arcturus would review the questionnaire to ensure that (1) the investor was accredited and (2) the investment was suitable for the particular investor. This review included looking at the investor's net worth and employment. According to Balunas, the Defendants would also check on the potential investor's experience with oil and gas investing.

After reviewing these documents, the Defendants would sometimes call prospective investors for additional information, though this would happen less often for "repeat clients." The Defendants would then request that each prospective investor reverify their suitability information. Bull also suggested that they would seek other updates on each investor's suitability from "time-to-time." If the investor did not qualify as an accredited investor, the Defendants would reject the investor.[6] Both Bull and Billy Cooper, a former Arcturus employee, stated that the Defendants would reject non-accredited investors, but Bull could not remember any specific rejections. Cooper also believed that some of the projects may have had non-accredited investors. Parvizian disagreed and maintained that every investor was accredited.

---

[6] Even before rejecting an investor based on their questionnaire responses, Bull indicated that they would sometimes reject prospective investors before sending out the questionnaire if it seemed like the investment would not be suitable.

No. 17-10503

2. The Investors

Spread over the six projects, there were over 340 investors.[7] The record does not contain much information about these investors. The record only contains direct evidence about the qualifications of roughly 25 investors, leaving nearly 315 unaccounted for. But of the 25 investors about whom we have information, many had experience in the oil and gas field, direct experience with the Defendants, or both. One investor has prior experience with Orbit Energy. Another stated that he has "an engineering background" and "participated in other energy ventures with Escondido and Patriot Energy." Another stated that he has "done 83 of these projects over the last ten years." Another stated that he has "extensive experience in investing in domestic energy and often defer[s] to the advice of [his] energy advisors and petroleum engineers." Another has "past experience in oil and gas with various partial investment projects." Another has "past experience in oil and gas with Cocoal and British Petroleum." Another has "previous oil & gas experience with OG-7 Jay Pisquro." Another "previously invested in three different oil drilling and exploration projects." Another "previously invested in at least seven different oil and gas drilling, exploration, and/or production projects," some of which "were joint ventures which, like Arcturus, required active participation and voting." Another invested in two other drilling joint

---

[7] The number of investors is uncertain. For example, one document, prepared by the SEC, pegs the number at 380. The Defendants counted 341 investors. The Defendants, though, counted investors more than once if they invested in more than one joint venture. For example, if one investor took part in four joint ventures, he was counted four times. *See* Another document in the record counts 349 investors. That document, however, lists many investors more than once.

The parties also disagree on the number of investors per venture. According to the Defendants' count, there were 94 investors in Hillock, 61 in Piwonka, 59 in Conlee, 4 in Fraley-Nelson, 35 in Chips, and 88 in Wied Field. According to the SEC, there were 108 investors in Hillock, 57 in Piwonka, 71 in Conlee, 4 in Fraley-Nelson, 35 in Chips, and 105 in Wied Field.

ventures. And another has "past experience in oil and gas with Choice Exploration."

Besides those with oil and gas experience, at least five other investors have prior experience with the Defendants. Other investors had more general business experience. For example, one investor is a senior vice president at Capitol One and manages an operating budget of $500,000,000. Another has invested millions in publicly traded stocks and "numerous" joint venture investments.

Beyond these investors, the record contained information about five investors who seemed to lack specialized experience.

Outside of this direct information about investors, the Defendants made a few global statements about the investors. Parvizian stated that every investor was accredited. Balunas discussed the investors at length. He repeatedly emphasized that the investors were "sophisticated people." Balunas stated that many investors "had their CPAs or attorneys call" the Defendants. And others personally visited the well or spoke with the drilling operator or onsite drilling engineers. Bull assumed that some investors were new to oil and gas investment. But Cooper stated that "most of the people [he] spoke to [had] invested in oil and gas before."

### 3. The Drilling Projects

The drilling projects were split into multiple stages. First, in the capitalization stage, the Defendants sought investors for each individual drilling project. According to the signing documents, investors collectively would pay a fixed price for a "Turnkey Drilling Contract." The Manager of the drilling project would then use those funds to purchase a working interest in a prospect well, which would entitle it to drill, test, and complete the well. The working interest also entitled the project to a share of the well's net revenue.

No. 17-10503

After capitalization, the drilling project would begin initial operations. Initial operations included the drilling and testing of the prospect well. The Manager of each drilling project was responsible for the initial operations. Aschere, for example, was responsible for managing the initial operations of the Conlee well. To complete the initial operations, the Manager would take the investors' funds and subcontract with a drilling operator who would drill and test the well. The operator for each project was identified in the corresponding CIM.

After drilling and testing the well, the Managers would recommend whether or not to complete the well.[8] The investors would then vote on the recommendation. If the investors voted in favor, then they would all be required to pay a completion assessment, which covered the cost of entering into a "Turnkey Completion Contract." If an investor did not pay the completion assessment, he abandoned his interest in the well, did not pay any further assessments, and had no right to any revenue.

After completion, the investors could elect, at the Manager's recommendation, to engage in special operations. Special operations could include drilling deeper, fracking, or completing additional zones in the well. These operations were subject to special assessments. The investors could also choose to engage in additional operations, which were subject to additional assessments.

## B. PROCEDURAL HISTORY

In December 2013, the SEC filed this civil enforcement action, alleging that the Defendants violated Section 5(a) and (c) of the Securities Act and Section 17(a) of the Exchange Act. The SEC argued that interests in these

---

[8] "In simple terms, [completing a well means] the gas well moves from construction to extraction phases." JAMES T. O'REILLY, THE LAW OF FRACKING § 6:9 (2018). This process usually includes placing equipment into the well and drawing out oil or gas.

No. 17-10503

drilling projects qualified as securities, and the Defendants tried to avoid federal securities laws by calling the projects joint ventures and labeling the investors as partners.  The Defendants argued that the projects were joint ventures because the investors had powers, rights, and management obligations.  Both parties filed motions for summary judgment, and the district court granted the SEC's motion.

The district court held that interests in the drilling projects were sold as securities pursuant to *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946).  The parties agreed that only one factor from *Howey* was in dispute—whether the investors expected to profit "solely from the efforts of" the Defendants.  This factor is governed by *Williamson v. Tucker*, 645 F.2d 404 (5th Cir. 1981), which sets out three factors for determining whether investors expect to profit solely from third-party efforts.  The drilling interests qualified as securities for three main reasons, which correspond to the three factors in *Williamson*.  First, the district court held that the investors had no real power to control the venture.  Despite having some powers in the JVAs, the court held that these powers were illusory because the investors had no way of contacting each other, and the Defendants would not provide contact information.  Without the ability to communicate, they could not amass the votes they needed to control the drilling projects.

Second, the court held that the investors were inexperienced and lacked expertise in the oil and gas field.  The investors lacked experience, according to the district court, because the Defendants marketed their drilling interests through a broad cold-calling campaign.  The investors were also forced to rely on the Defendants to acquire all of their information.

Third, the court held that the investors were reliant on the Defendants. The Defendants controlled all of the investors' assets, and a replacement manager could not access those assets—only the Defendants could.  The investors also relied on the Defendants for all of their information.

9

## II. DISCUSSION

This court reviews a district court's grant of summary judgment de novo, using the same legal standard as the district court. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007). Summary judgment is appropriate where there is no genuine issue of material fact and the parties are entitled to judgment as a matter of law. *Id.* All reasonable inferences must be drawn in favor of the nonmovant, but "a party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." *Id.* (internal quotation marks omitted).

Under Section 5 of the Securities Act, it is "unlawful for any person, directly or indirectly" to use interstate commerce to offer to sell "any security" unless the person has filed a "registration statement" for the security.[9] 15 U.S.C. § 77e(c). The Securities Act broadly defines the term security to include a long list of financial instruments, including "investment contracts," the type of security at issue here. *See* 15 U.S.C. § 77b(a)(1). While Congress defined the term "security," it left it to the courts to define the term "investment contract." In *Howey*, the Supreme Court did exactly that and developed a "flexible" test for determining whether an investment contract qualifies as a security:

> [A]n investment contract for purposes of the Securities Act means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party . . . .

*Howey*, 328 U.S. at 298–99. Distilled to its elements, an investment contract qualifies as a security if it meets three requirements: "(1) an investment of money; (2) in a common enterprise; and (3) on an expectation of profits to be

---

[9] It is undisputed that the Defendants never filed a registration statement for the interests in their drilling projects.

derived solely from the efforts of individuals other than the investor." *Williamson*, 645 F.2d at 417–18 (citing *SEC v. Koskot Int'l, Inc.*, 497 F.2d 473 (5th Cir. 1974)).

When applying this test, courts should disregard "legal formalisms" and, instead, focus on the substance of the deal—"the economics of the transaction under investigation." *Reves v. Ernst & Young*, 494 U.S. 56, 61 (1990). Even though certain contracts might "superficially resemble private commercial transactions" and lack "the formal attributes of a security," they still can qualify as securities. *Youmans v. Simon*, 791 F.2d 341, 345 (5th Cir. 1986)

Here, the parties do not contest that the drilling interests met the first two *Howey* factors.[10] The primary issue is whether the drilling interests satisfied the third factor—whether the investors expected to profit "solely from the efforts of" the Managers.

When determining whether investors expect to rely "solely on the efforts of others," courts construe the term "solely" "in a flexible manner, not in a literal sense." *Youmans*, 791 F.2d at 345. And for good reason. If courts interpreted "solely" in a literal way, a party could "evade liability" merely by parceling "out [minor] duties to investors." *Id.* at 345–46. To prevent this possibility, courts find the third *Howey* factor met if "the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise." *Williamson*, 645 F.2d at 418. Even though an investor might retain "substantial theoretical control," courts look beyond formalities and examine

---

[10] Gonzalez states, in one sentence, that none of the *Howey* factors were satisfied, but his brief is dedicated solely to the third factor. Because he did not provide any support for his argument, he waived it. *United States v. Upton*, 91 F.3d 677, 684 n.10 (5th Cir. 1996) ("[C]laims made without citation to authority or references to the record are considered abandoned on appeal.").

whether investors, in fact, can and do utilize their powers. *Affco Invs. 2001, LLC v. Proskauer Rose, L.L.P.*, 625 F.3d 185, 190 (5th Cir. 2010).

Here, the court must apply these general principles to a partnership.[11] Interests in a partnership can satisfy the third *Howey* factor and qualify as an "investment contract." But not all partnerships qualify. For example, partners in a general partnership can guard "their own interests" with their "inherent powers" and do not need protection from securities laws—they can "act on behalf of the partnership"; "bind their partners by their actions"; "dissolve the partnership"; and "are personally liable for all liabilities of the partnership." *Youmans*, 791 F.2d at 346. General partners are, in short, "entrepreneurs, not investors." *Id.* Accordingly, general partnership interests typically do not qualify as securities. *Id.* And a litigant trying to prove otherwise must overcome the "strong presumption" that "a general partnership . . . is not a security." *Nunez v. Robin*, 415 F. App'x 586, 589 (5th Cir. 2011) (per curiam) (unpublished) (quoting *Youmans*, 791 F.2d at 346); *see also Youmans*, 791 F.2d at 346 ("A party seeking to prove the contrary must bear a heavy burden of proof.").

Limited partners are different. Unlike general partners, limited partners lack significant powers—their "liability for the partnership is limited to the amount of their investment"; "[t]hey cannot ordinarily dissolve the partnership . . . [or] bind other partners"; and "they have little or no authority to take an active part in the management of the partnership." *Youmans*, 791 F.2d at 346. Without any significant powers, a limited partner is like "a stockholder in a corporation." *Id.* As a result, "limited partnership interests

---

[11] This court applies the same analysis to partnerships and joint ventures. *Youmans*, 791 F.2d at 346 n.2 ("Our discussion of partnerships applies with equal force to joint ventures since this kind of business investment device is the same for purposes of the federal securities laws.").

may be considered a security." *Id.* (citing *Sibel v. Scott*, 725 F.2d 995, 998 (5th Cir.), *cert. denied*, 467 U.S. 1242 (1984)).

While we typically employ a "strong presumption" that "a general partnership . . . is not a security," *Nunez*, 415 F. App'x at 589 (quoting *Youmans*, 791 F.2d at 346), we have noted that even general partners can lack managerial powers.  Labeling a partnership as general or limited does not always reflect what really matters: the division of power among the partners.  While general partners usually have an array of ways to influence the partnership, partnership documents or other barriers sometimes curtail their power.  Under these circumstances, even a general partnership interest can qualify as a security.

To guide courts in applying the third *Howey* factor to these in-between situations, this court set forth the three *Williamson* factors—the primary source of contention here.  These factors flesh out situations where investors depend on a third-party manager for their investment's success, and each factor is sufficient to satisfy the third *Howey* factor.  Under the *Williamson* factors, a partner is dependent solely on the efforts of a third-party manager when:

> (1) an agreement among the parties leaves so little power in the hands of the partner or venturer that the arrangement in fact distributes power as would a limited partnership; or (2) the partner or venturer is so inexperienced and unknowledgeable in business affairs that he is incapable of intelligently exercising his partnership or venture powers; or (3) the partner or venturer is so dependent on some unique entrepreneurial or managerial ability of the promoter or manager that he cannot replace the manager of the enterprise or otherwise exercise meaningful partnership or venture powers.

No. 17-10503

*Williamson*, 645 F.2d at 424.[12]  Courts, however, are not limited to these three factors—other factors could "also give rise to such a dependence on the promoter or manager that the exercise of partnership powers would be effectively precluded."  *Id.* at 424 n.15.  But regardless of which factor is at issue, a party can only prove one of the *Williamson* factors by looking to the unique facts of the arrangement at issue.  Differently put, a party faces a "factual burden" when proving one of the *Williamson* factors.  *Id.* at 425.

## A. THE FIRST *WILLIAMSON* FACTOR

The first *Williamson* factor is whether the drilling projects left the investors so little power "that the arrangement in fact distributes power as would a limited partnership."  *Id.* at 424.  In determining whether an arrangement deprives investors of power, courts look to two sources of evidence.  First, courts look to the legal documents setting up the arrangement to see if investors were given formal powers.  *See, e.g.*, *id.* (looking to the "partnership agreement" to see if partners were given power).  Second, courts examine how the arrangement functioned in practice, which includes looking for barriers to investors using their powers.  *See, e.g.*, *Nunez*, 415 F. App'x at 590 (looking to the fact that an investor exercised power over the partnership's finances); *Long v. Shultz Cattle Co.*, 881 F.2d 129, 134 (5th Cir. 1989) (crediting the jury's conclusion that investors, in practice, followed the manager's

---

[12] A number of other circuits have adopted the *Williamson* factors as a way to analyze the third *Howey* factor.  *See, e.g.*, *SEC v. Shields*, 744 F.3d 633, 644 (10th Cir. 2014) (adopting the *Williamson* factors); *United States v. Leonard*, 529 F.3d 83, 90–91 (2d Cir. 2008) (same); *SEC v. Merch. Capital, LLC*, 483 F.3d 747, 755–56 (11th Cir. 2007) (same); *Stone v. Kirk*, 8 F.3d 1079, 1086 (6th Cir. 1993) (same); *Koch v. Hankins*, 928 F.2d 1471, 1477–81 (9th Cir. 1991) (same); *Rivanna Trawlers Unlimited v. Thompson Trawlers, Inc.*, 840 F.2d 236, 241 (4th Cir. 1988) (same).

No. 17-10503

recommendations).   How the arrangement functioned is typically the most important indication of whether investors had power.[13]

Here, this factor turns on six critical disputes—(1) the Managers' formal powers as compared to the investors' formal powers; (2) whether the investors exercised their formal powers; (3) the voting structure of the drilling projects; (4) information available to the investors; (5) communication among the investors; and (6) the number of investors.   All these factors go towards determining whether the investors had power to control the drilling projects.

### 1. The Managers' and Investors' Formal Powers

Arcturus and Aschere did possess a significant amount of power.   First, and most significantly, the JVAs make clear that they had the power to control "the day-to-day Operations" of the drilling projects.   The JVAs defined "Operations" broadly as any activity related to acquiring, drilling, testing, completing, equipping, or otherwise working on the prospect well.   The ability to control the daily "Operations" also came with "full and plenary power" to, among other things, (1) retain operators to drill and complete wells, (2) conduct

---

[13] Gonzalez dedicates much of his brief to arguing that the district court erred by looking to post-investment conduct when it was determining the expectations of the parties at the time they entered the drilling investment contracts.  This argument is unpersuasive.  First, a recent opinion by this court explicitly held that post-investment conduct is relevant to determining the expectations of the parties at the time they entered the contract.  *See SEC v. Sethi*, No. 17-41022, 2018 WL 6322153, at *3 n.3 (5th Cir. Dec. 4, 2018).  Second, other circuits allow courts to look at "post-investment conduct." *Shields*, 744 F.3d at 646; *see also Merch. Capital*, 483 F.3d at 760; *Koch*, 928 F.2d at 1478 (looking to the "practical possibility of the investors exercising the powers they possessed pursuant to the partnership agreements.").  Third, even before the explicit holding in *Sethi*, this court, in nearly every case, did in fact analyze post-investment activity. *See, e.g., Nunez*, 415 F. App'x at 590 (looking to the fact that the investor exercised power over the partnership's finances); *Long*, 881 F.2d at 134 (crediting the jury's conclusion that investors followed the manager's recommendations); *Youmans*, 791 F.2d at 347 (directing the trial court on remand to further develop the "practical application" of the relevant contract provisions).  Fourth, Gonzalez cites no cases in support of his position—all his cited cases either (1) hold exactly the opposite of what he argues, or (2) are distinguishable because they address situations where investors delegated power to a manager after forming the initial contract. *See, e.g., Holden v. Hagopian*, 978 F.2d 1115, 1119 n.6 (9th Cir. 1992).

surveys, (3) execute "any and all contracts and agreements," (4) make "all" elections or decisions and "bind the Joint Venture," (5) make payments with funds belonging to the projects, (6) execute operating agreements, and (7) execute powers of attorney.  Second, when dealing with third parties, the Managers had the power to execute contracts that contained "such provisions as the Managing Venturer deems expedient."

Third, the Managers had the power of the purse and could "charge the Joint Venture . . . all reasonable expenses incurred by the Managing Venturer in the operation of the Joint Venture."  Fourth, these powers were exclusive— according to the JVA, no investor besides the Manager could "act on behalf of, sign or bind the Joint Venture with respect to Operations of the Joint Venture." Finally, the Managers also had "sole and absolute discretion" to interpret ambiguous or unclear provisions.

While the Managers had significant power, the investors, at least formally, were not without countervailing powers.  Most importantly, the investors had the power to remove Arcturus and Aschere as managers with a 60% vote—a power this court has called "an essential attribute of a general partner's . . . authority." *Youmans*, 791 F.2d at 347.  This court has also held that similar removal provisions do not divest investors of their power. *Williamson*, 645 F.2d at 409, 424 (suggesting that 60% and 70% removal requirements did not shield the manager from removal); *Youmans*, 791 F.2d at 346-47 (holding that the investors had power over the scheme, in part because of a majority vote removal provision); *see also Holden*, 978 F.2d at 1120 (finding no investment contract where manager could be removed with simple majority vote).  Nor is the 60% requirement as burdensome as removal provisions that other courts have addressed.  *See, e.g.*, *Merch. Capital*, 483 F.3d at 757-58 (holding that provisions requiring unanimous, for-cause removal made manager "effectively unremovable").

The investors also had authority over almost all of the Managers' powers. For example, the JVAs clarify that the "Joint Venture and all of its affairs, property, and Operations shall be managed and controlled by a majority of the Venturers." The JVA also qualifies the Manager's power by giving the investors veto power—the seven "Operations" powers outlined above are all subject to "the affirmative Vote of the Venturers." If this provision was followed in practice, then the Manager could not bind the drilling project without the investors voting to affirm. The investors also had the power to develop rules and procedures governing meetings and voting, demand a meeting, amend the JVA, receive financial information and information about third-party transactions, and inspect the project's books. The signing documents given to the investors also make clear that the investors will be required to take an active role in governing the drilling projects. They also clearly state that the venture is not a security, putting the investors "on notice" that "federal securities acts" will not protect them. *Williamson*, 645 F.2d at 422. Further, if an investor did not send money for an assessment, it was interpreted as a "no" vote, so the baseline voting rules did not necessarily favor the Managers, unlike other cases. *See Merch. Capital*, 483 F.3d at 760 ("[T]he voting process was tilted in [the defendant's] favor from the very start. The partnership agreement provided that unreturned and unvoted ballots were voted in favor of management.").

Added together, these provisions, at least formally, give the investors significant control over the drilling projects. Indeed, nearly all of the Managers' powers are subject to an affirmative vote by the investors. Other cases have held that investors with similar powers possessed control over the partnership. *See, e.g., Koch*, 928 F.2d at 1478–79 (holding that partners had at least formal power where "[a]dditional assessments of capital must be approved by 75 percent of the partnership units; a majority of the partnership

units can remove any person from a management position; decisions regarding the management and control of the business must be made by a majority vote").

## 2. The Investors' Powers in Practice

But, as the case law makes clear, formal powers are not dispositive—courts must determine whether investors can and do exercise those powers. *See, e.g.*, *Youmans*, 791 F.2d at 347 (directing the trial court on remand to further develop the "practical application" of the relevant contract provisions). Here, the record suggests that the investors utilized their powers. The record shows votes taken on a variety of actions, such as increasing production units; completion; workover and recompletion; new projects; and dissolution. The record also contains communications from the Managers requesting a vote on a subsequent cleanout proposal. Fifteen investors also submitted affidavits declaring that they had the power to, and did in fact, vote on a variety of decisions. And the record does not show that Arcturus or Aschere took any significant actions without the investors' prior approval. The fact that the investors voted and took actions to manage the drilling projects makes this case different than others where the district court appropriately granted summary judgment. *See Sethi*, 2018 WL 6322153, at *4 (affirming the district court's grant of summary judgment where "[t]he investors never held a meeting and did not vote on any matter.").

## 3. The Projects' Voting Structure

The SEC and the district court placed great weight on the contract provisions covering completion assessments and additional assessments. When faced with the Managers' recommendation to complete a well and enter a turnkey completion contract, the investors can vote for or against completion. If the investors vote to complete the well, then the project charges them a completion assessment of up to $100,000. If an investor fails to pay the assessment, then he is considered to have abandoned his interest. For

18

additional assessments, if the investors vote to approve additional work, each investor has one of three choices.  Investors must either pay the assessment, abandon their interest, or pay a penalty if they pay the assessment late.  An investor who pays late becomes a non-participating investor and can be reinstated only by paying the penalty.  This arrangement, according to the SEC, presents investors with a Hobson's choice—follow the manager's recommendation or you are out.[14]

These provisions, however, do not operate like the SEC suggests.  To help clarify, these provisions must be placed in the context of an inherently speculative investment like drilling.  One law review article describes the initial payment in these contracts as the cost of "being allowed to participate" until the point when the investors choose whether to complete the well.  R.K. Pezold & Danny Richey, *The "Industry Deal" Among Oil and Gas Companies and the Federal Securities Acts*, 16 Tex. Tech L. Rev. 827, 833 (1985) [hereinafter, *Industry Deal*].  Splitting the process into drilling and completion makes sense because it allows investors to get a glimpse inside the well without paying for completion upfront.  Only later, after gathering more information from the drilling process, do investors choose if they want to complete the well.  This split between the initial drilling and completion effectively gives investors an additional chance to cut their losses.  The signing papers follow this general split and make clear that investors are only entering a turnkey drilling contract—completion, which is not mandatory, requires additional investment.

---

[14] The SEC argues that investors who oppose the Manager's recommendation are either charged a penalty or kicked out of the project.  But that assertion is not true.  We cannot find anywhere in the offering documents where an investor is kicked out for voting against the Manager's recommendation.  The only reason an investor is kicked out is for failing to pay his proportionate share of completion costs after an affirmative vote has been taken.

No. 17-10503

Returning to the investors' choices with this basic background, the arrangement does not strip the investors of power. If an investor votes for completion, he does not lose power because he must pay for completion costs. If the investor thinks the well is a lost cause, then allowing him to abandon his interest also does not strip him of power. The entire project is presumptively organized around one well—if the investor thinks it is not going to be profitable after drilling, then he likely would want out of the project without wasting additional money.[15] These investors are free to "stand aside, incur no further costs, and allow the 'consenting owners' to proceed with any completion activities desired." *Industry Deal*, at 833 n.27.

When it comes to subsequent operations, if an investor is unclear what to do, he can avoid paying. The investor then becomes a non-participating investor. But the investor's initial silence is not permanent—the investor can pay a "pre-agreed and substantial economic penalty" and become a participating investor again. *Industry Deal*, at 834 n.27. This penalty also makes sense. When an investor fails to pay operation costs, other participating investors are forced to take up the financial slack, increasing their risk. The penalty serves to compensate the "risk-taking" investors who bore the added risk. *Industry Deal*, at 834 n.27. While the SEC argues that these consequences eliminate any voting power, they can be seen in a more positive light as preventing free-riding.

The case law, while not oil-and-gas specific, further supports this intuition. In *Williamson*, this court did not attach any significance to a similar voting plan. 645 F.2d at 409. The voting plan there required the manager to present the investors with "any proposal for development." *Id.* at 409. The

---

[15] An email from at least one investor confirms this intuition. In the email, the investor, angry at the project's failure, says that he is "far more comfortable not losing more money than . . . putting more into this losing project."

investors could approve the proposal by a "vote of the holders of 60% or 70% in joint venture interests." *Id.* Importantly, if the investors accepted the proposal, the investors who approved it were "obligated to purchase the interests of those who [did] not." *Id.* Structurally, the consequences were like those here—vote yes, pay more money; vote no, you are out.[16] If such a structure was not a Hobson's choice there, it is unclear why it would be here.

### 4. The Source of Investors' Information

The SEC argues, and the district court held, that the investors' powers were weak because they relied on the Managers for information about the drilling projects.[17] Some case law does suggest that investors are powerless when all of their pertinent information comes from the managers.[18] But mere control over information does not, on its own, strip investors of their power to vote. The source of information only matters when the investors do not receive enough information to make an educated decision. *See Sethi*, 2018 WL 6322153, at \*4 (affirming the district court's grant of summary judgment because the defendant "gave the investors little to no information"); *Merch. Capital*, 483 F.3d at 759 ("[The defendant] controlled how much information

---

[16] The main difference was that dissenters in *Williamson* got their investments back, but that has more to do with riskiness than control of the venture.

[17] Control of information can go to the first or second *Williamson* factors. *See Long*, 881 F.2d at 137. It goes to the first factor when the party in control of information prevents otherwise competent investors from exercising control over the partnership or venture. For example, the controlling party can provide only a small amount of information that supports its position. *See Merch. Capital*, 483 F.3d at 759. Control of information goes to the second factor when the investors are not sophisticated enough to understand the information they are given. *See Long*, 881 F.2d at 135–36.

[18] The SEC relies on *Long* for this point, but this reliance is misplaced. *Long* was primarily about whether investors can acquire experience and knowledge from the defendant—the second *Williamson* factor—not the source of the information. When it came to the first *Williamson* factor, the court in *Long* relied on the jury's conclusion that the investors relied exclusively on the defendant's recommendations, as established by a documented pattern of voting. *See Long*, 881 F.3d at 134.

appeared in the ballots, and did not submit sufficient information for the partners to be able to make meaningful decisions to approve or disapprove debt purchases."). In *Merchant Capital*, for example, the Eleventh Circuit held that investors could not effectively exercise their voting rights because the manager only gave investors three pieces of information, which was not "sufficient information for the partners to be able to make meaningful decisions." *Id.* at 759. This conclusion was established at trial by expert testimony. *Id.*

This case is not like *Merchant Capital*. The record suggests that investors had numerous sources of information. The Managers sent email updates to the investors on numerous occasions. Some emails contained day-by-day updates. Other emails in the record had attachments of "comprehensive digital daily drilling reports." Another email references a 24-hour "video surveillance" system being installed for remote access of visual management of drilling operations." Some emails in the record welcomed investors to come visit the drilling site. And fifteen different investors corroborated this record evidence with affidavits, declaring that they stayed well-informed through "persistent status updates" in the form of "geologic data, well data, proposed oil and gas contracts, . . . video surveillance and other forms of live monitoring." All this information goes far beyond the three pieces of information provided to investors in *Merchant Capital*. More importantly, this court does not have the "trial testimony" of numerous witnesses and experts to determine, as a matter of law, that the investors had enough information to "make an informed decision." *Merch. Capital*, 483 F.3d at 758.

The SEC also seems to suggest that the investors lacked control because the Managers picked the experts who were providing much of the technical data. But it is unclear whether this choice mattered. It is possible, for example, that the Managers were simply conduits for information—the consultants sent the Managers information about the well, which the

## No. 17-10503

Managers then passed to the investors. As noted above, the Managers sometimes passed along the raw data they received from the operators. If the investors and Managers had access to the exact same data, the investors could draw their own conclusions about the prospect wells. And the SEC does not point to any facts showing that the consultants presented biased information. Nor does the SEC point to any facts showing that the Managers misled the investors with false or altered information.

### 5. Investor Communications

The SEC argues that the investors' powers were useless because they could not contact each other and coordinate their votes. The SEC also argues that the Defendants would not release investor contact information. The record lends some support to these contentions.[19] According to one investor, Douglas Traver, Parvizian withheld investor information at least once. Four of the six JVAs also protected investor contact information as "confidential and a trade secret of the Managing Venturer." For these four projects, no investor was entitled to learn the identity of other investors. And when the Managers sent emails to all of the investors on a given project, they generally blind-copied the recipients, preventing them from easily contacting other investors. Most troublingly, one investor, Richard Ullrey, declared that Parvizian threatened legal action against him for contacting other investors.

The case law adds force to these arguments. Courts have previously held that investors might lack real power if they are unacquainted and unable to

---

[19] The district court placed weight on the fact that the investors were "located across the United States." But this factor originated with a Supreme Court opinion from 1946, and it is antiquated today. *Howey*, 328 U.S. at 299. The investors, if they had contact information for each other, could communicate using telephone, email, text messages, or video calls. While physical proximity still deserves some weight—it might, for example, play some role in facilitating introductions—it is not necessarily a critical factor with the many forms of communication available today.

communicate. *Merch. Capital*, 483 F.3d at 758 n.8 (holding that partners did not have meaningful voting power, in part, because "[s]uch a move would have required a two-thirds vote of geographically distant, unacquainted partners"); *cf. Howey,* 328 U.S. at 299.

But the record is not as clear as the SEC suggests. The record shows that the investors did in fact communicate with each other. They communicated on phone calls. The record also contains emails between a multitude of investors communicating about a vote to complete a drilling project. Several investors also declared that they communicated with each other at venture meetings. Another investor declared that he received investor contact information. The record also shows documents in which the Managers identified the other investors. And even though Ullrey declared that he feared contacting other investors after Parvizian allegedly threatened him, he nevertheless sent emails to other investors two years later.

The district court did not analyze these documents. With so many investors declaring that they could communicate with each other, and evidence of actual communications, the Defendants raised a genuine issue about whether the investors could communicate with each other and organize. Ullrey's potentially conflicting statements are a case in point on why a full factual hearing with cross-examination is needed.

### 6. The Number of Investors

Each drilling project had anywhere from 35 to 108 investors. These numbers run on the high end of the case law. And they seem to be on the high end of industry norms.[20] But at least one case held that 160 investors in a partnership was not a number so large that each partner's role was "diluted to

---

[20] In *Industry Deal*, the authors explain that these contracts are normally structured with three investors and an operator on a "third-for-a-quarter" basis. *Industry Deal*, at 833. Investors pay one-third of the drilling costs and receive one-quarter of the revenue.

the level of a single shareholder." *Koch*, 928 F.2d at 1479 & n.12; *see also Rivanna*, 840 F.2d at 242 n.10 (4th Cir. 1988) (Powell, J., sitting by designation) (finding that a partnership with 23 members was not a security). Further factual development is needed to determine whether the size of each drilling project stripped the investors of their power.

### 7. Conclusion of the First *Williamson* Factor

In sum, there is evidence in the record that (1) the investors had formal powers, (2) they used these powers, (3) the voting structure was not necessarily coercive, (4) the investors received information, (5) they communicated with each other, and (6) the number of investors was not so high that it eliminated all of their power. We reverse the district court's ruling on the first *Williamson* factor.

### B. THE SECOND *WILLIAMSON* FACTOR

The second *Williamson* factor is whether the drilling project investors were "so inexperienced and unknowledgeable in business affairs" that they were "incapable of intelligently exercising" their powers. *Williamson*, 645 F.2d at 424. The second *Williamson* factor applies to both investors and offerees. Generally, an interest in a partnership is more likely to be a security if it is sold to "inexperienced and unknowledgeable members of the general public." *Id.* at 423. But proving that investors are inexperienced requires evidence about the investors themselves. *See Merch. Capital*, 483 F.3d at 762 ("[T]he SEC presented uncontradicted evidence that the individual partners had no experience in the debt purchasing business."); *Nunez*, 415 F. App'x at 589 (examining the experience of the individual plaintiff); *Williamson*, 645 F.2d at 424–25 (examining the experience of each investor). And investor expertise "must be considered in relation to the nature of the underlying venture." *Long*, 881 F.2d at 135. This requirement, however, should not be read to suggest that investors necessarily need a specialized background. If evidence shows

that an investor can intelligently control his investment, then courts do not require specialized experience. *See, e.g.*, *Robinson v. Glynn*, 349 F.3d 166, 171 (4th Cir. 2003) (holding that specialized experience was not required because the investor showed he was capable of managing his investment); *Youmans*, 791 F.2d at 343, 347 (finding the plaintiff, a physician, sufficiently experienced because he "also engaged in a number of business transactions not connected with [the defendants]").

For example, in *Long* the investors purchased interests in a cattle farm, with each investor buying individual cows that were jointly managed by the defendants. 881 F.2d at 134–136. One important question was whether the investors had enough knowledge to manage their own herd of cattle. And when answering this question, the court did not look only to investors' experience in cattle raising—it looked to the investors' attempts to manage the cattle they purchased from the defendants.

Looking at those actions, the court easily concluded that the investors "lacked the experience necessary to care for, feed, and market their cattle." *Id.* at 135. Some investors "visited the feedyard on one occasion," but "there was no evidence that [they] sought to give any individual instruction regarding the care and feeding of their cattle." *Id.* One of the investors even "expressed the mistaken impression that a heifer was a breed of cattle." *Id.* The investors' actions, established at trial, showed that they could not manage their investments, and their lack of specialized experience was the reason why.

Similarly, in *Nunez* an investor-plaintiff argued that he was forced to rely on the manager because he lacked experience in "sand and gravel mining." 415 F. App'x at 589. The investor, however, had taken a variety of actions to manage his investment. *Id.* at 590 ("The record establishes that [the investor] participated in other managerial decisions in his role as managing partner."). Even if the investor lacked specialized experience, he failed to prove that this

lack of experience prevented him from "meaningfully exercis[ing] his managerial powers." *Id.* at 591.

## 1. The Investors

Here, the SEC argues that the investors were inexperienced for two reasons. First, the Defendants engaged in an indiscriminate cold-calling campaign that did not seek out experienced investors. Second, the SEC points to statements from four investors that they were inexperienced in drilling investments. These arguments are not dispositive—at summary judgment, we cannot make an inference about a group of over 340 investors based on this limited evidence.

The cold-calling campaign is probative of the investors' experience. In assessing the second *Williamson* factor, courts rightly examine how a partnership acquired its members. *See, e.g.*, *Long*, 881 F.2d at 135 (holding that investors in a cattle farm were not experienced, in part, because the scheme "advertised its feeding program in financial publications . . . and in large-city newspapers . . . and did not advertise in agricultural periodicals or in other publications likely to have a readership acquainted with cattle-feeding"). A court can glean information about investors by examining how and from where the partnership attracted them. But when determining whether investors are experienced, looking at marketing methods is, at best, circumstantial evidence about the investors.[21] A better place to look is directly

---

[21] The SEC stressed the nationwide cold-calling campaign in their briefs and oral argument. By emphasizing that the Defendants called investors across the country from a purchased lead list, the SEC likened the Defendants' marketing strategy to that of an indiscriminate telemarketer. If the SEC had presented undisputed evidence that the Defendants used indiscriminate marketing methods, then we agree that this case would fall into the purview of *Long*. But this case differs from *Long* and other similar cases.

In *Long*, the court confronted undisputed evidence that the defendants sought inexperienced investors—the defendants conceded so at trial. *Id.* at 135. Here, by contrast, the Defendants maintain that they did not seek out inexperienced investors. And they

at the investors' actual qualifications. The case law follows this analysis, looking to investor qualifications and using advertisement methods, if at all, merely to bolster a conclusion—it is rarely the only piece of evidence. *See, e.g.*, *Long*, 881 F.2d at 134–36 (looking to actual evidence of investor experience and then looking to advertising method); *Aqua-Sonic*, 687 F.2d 577, 583 (2d Cir. 1982) (same); *see also Williamson*, 645 F.2d at 425 (looking to each investor's business experience alone). And when it comes to the investors' actual experience, the record does not clearly entitle the SEC to summary judgment.

As the Defendants point out, the record shows that many investors did, in fact, have experience in oil and gas drilling. For example, one investor declared that he had "an engineering background" and "participated in other energy ventures with Escondido and Patriot Energy." In an email, another investor disclosed that he had "done 83 of these projects over the last ten years." Another investor declared that he has "extensive experience in investing in domestic energy and often defer[s] to the advice of [his] energy advisors and petroleum engineers." Still others had general business experience.

The record also shows that various investors had advisors helping them make decisions—an important factor in the caselaw. *See, e.g.*, *Robinson*, 349 F.3d at 171; *Banghart v. Hollywood Gen. P'ship* 902 F.2d 805, 808 n.5 (10th Cir. 1990); *Rivanna*, 840 F.2d at 242 n.10. Balunas stated that many investors

---

support this argument with competent summary judgment evidence, which, if believed by a factfinder, would show that they sought experienced investors. The record suggests that the potential investors on the lead list were vetted for investing experience before being added to the list. The record also suggests that many investors had prior experience with the Defendants. At summary judgment, viewing the evidence in the light most favorable to the Defendants, we cannot conclude that the Defendants sought out inexperienced investors. The SEC failed to eliminate genuine issues of material fact about the scope of the Defendants' marketing and the types of investors they targeted. These questions are better resolved by a factfinder.

"had their CPAs or attorneys call" the Defendants before investing. Others personally visited the well or spoke with the drilling operator or onsite drilling engineers. Another stated that he has "extensive experience in investing in domestic energy and often defer[s] to the advice of [his] energy advisors and petroleum engineers."

The Defendants also required the investors to represent that they had business experience and were capable of intelligently exercising their management powers.[22] The CIM made clear that only qualified investors were eligible. The investors were also required to represent that they were accredited investors.[23] And several of the investors invested in prior Parvizian ventures, a factor that this court previously relied upon when holding that investors were experienced. *See Williamson*, 645 F.2d at 425 ("The defendants' exhibits contain documents from previous ventures which indicate that [two investors] had already been members of other joint ventures organized by [the managers].").

---

[22] The Defendants belatedly argue that they might qualify for an exemption from the Securities Act. In 2012, the SEC amended Rule 506 to permit "an issuer to engage in general solicitation or general advertising in offering and selling securities pursuant to Rule 506" without registering the securities, so long as the issuer meets two requirements: (1) "all purchasers of the securities are accredited investors" and (2) "the issuer takes reasonable steps to verify that such purchasers are accredited investors." SEC, Eliminating the Prohibition Against Gen. Solicitation & Gen. Advert. in Rule 506 & Rule 144a Offerings, Release No. 3624 (July 10, 2013). Because the Defendants required all investors to represent that they were accredited investors, Parvizian argues that this exception applies.

Parvizian waived this argument by not raising it earlier. *Hightower v. Tex. Hosp. Ass'n*, 73 F.3d 43, 44 (5th Cir. 1996) (holding that arguments raised for the first time in a petition for rehearing were "raised too late in the appellate process to be useful to this court, and they are deemed waived and have played no role in our decision"). But even if he had raised it, the transactions at issue occurred before these amendments, and he cites no legislative or judicial authority that they should apply retroactively.

[23] An "accredited" investor is a person with a net worth over $1,000,000 independently or combined with a spouse or with individual income over $200,000 or joint income over $300,000.

No. 17-10503

The SEC specifically points to statements by Ullrey that he "relied on [Parvizian's] determination [that completion of a well was appropriate] with no means to verify that this determination was correct" when he voted to complete a well.     But many other courts have refused to transform an investment into a security based on similar statements without further corroborating proof. *See, e.g.*, *Nunez*, 415 F. App'x at 589; *Robinson*, 349 F.3d at 172; *Banghart*, 902 F.2d at 808 n.5.  At summary judgment, this evidence is insufficient to eliminate all questions of material fact.

While Ullrey implies that he was an unsophisticated oil and gas investor, his email to Parvizian—one of the few emails we have from him—paints a different picture.  That email states that (1) he understood a fair amount of the underlying "geology" of different wells and felt capable of "comparing" reports from "each geologist"; (2) he was comfortable analyzing the "engineering" across wells; (3) he knew many drilling acronyms and terms; and (4) he knew how to analyze production zones and past production history.  As one example that he might not be as unsophisticated as the SEC argues, he specifically asked why fracking technology had not been used even though "the gas production has been 140 MCF monthly for 2008 and 2009" and "the fractional technology has been available for at least as long as this well has been in existence."

Outside of questions about his technological knowledge, the summary judgment record does not show conclusively that Ullrey was unsophisticated. He had an investment advisor he consulted.  And, as noted above, courts have held that an advisor is a critical fact showing that an investor does not lack sophistication. *See, e.g.*, *Robinson*, 349 F.3d at 171; *Banghart*, 902 F.2d at 808 n.5; *Rivanna*, 840 F.2d at 242 n.10.  He was a CPA and stated that he would feel comfortable analyzing the finances of the joint venture.  He also organized a lot of investors into an email thread.

No. 17-10503

This mixed record about Ullrey is a case in point. The summary judgment evidence about Ullrey is mixed, he has not been subjected to cross-examination, and his statements present quintessential credibility determinations. On summary judgment with the current record, we cannot conclude, as a matter of law, that Ullrey was inexperienced, as inexperienced is defined by *Williamson* and its progeny. A jury is better suited to determining whether Ullrey was capable of intelligently controlling his investments.

Nor can the court determine whether any of the unidentified investors were inexperienced. Through competing summary judgment motions, both parties asked the court to determine that the pool of over 340 investors had or lacked experience based on limited evidence about roughly 25. At summary judgment, the court cannot make factual inferences about roughly 340 investors based on such limited evidence, especially when that evidence is mixed.

### 2. The Offerees

The SEC also argues that the Defendants targeted inexperienced offerees. But the record with respect to offerees is limited. And the limited summary judgment record does not allow us to conclude, as a matter of law, that the offerees were necessarily inexperienced.

First, the tenor of the evidence is that the cold-call list was not meant to include inexperienced offerees. Cooper stated that the list might have included only accredited investors. He also suggested that salespeople did not target only new, accredited clients—they also called current clients, who would have prior knowledge of the Defendants. This prior relationship, as noted above, is an important factor in the caselaw. *See Williamson*, 645 F.2d at 425. Balunas also indicated that he only made offers to accredited investors. Meanwhile, the SEC presented no evidence to challenge these facts, which we must consider in the light most favorable to the Defendants.

No. 17-10503

Second, the evidence about investors—a sample that sheds light on the offerees—indicates that many were experienced in oil and gas investment. Other courts have used similar reasoning, inferring the offerees' qualifications from the group of eventual investors. For example, in *Aqua-Sonic*, the Second Circuit used investor qualifications to shed light on the type of investor that the defendant was targeting (i.e., to determine the offerees' qualifications). 687 F.2d at 583–84 ("However, none of the 50 licensees had any such [specialized] experience. This was not mere coincidence. The record does not indicate that any attempts were made to locate such purchasers."). Taking the eventual investors as a sample of the offerees, we cannot conclude that the offerees lacked experience. But we are equally incapable of making the opposite inference. Both parties seek to use a small subset of investors to establish the experience level of the entire group of offerees. And they both seek to do so without any direct evidence about the offerees' qualifications. Given the limited record and the procedural posture—summary judgment—we cannot determine whether the offerees were experienced or not. This factual determination is better left to a finder of fact.

### 3. Conclusion of the Second *Williamson* Factor

These facts taken together raise a genuine issue about the offerees' and investors' knowledge and experience.[24] The SEC's evidence does show that at

---

[24] The SEC argues that all investors and offerees need specialized experience. But no court has ever explicitly held that every investor needs specialized experience. Courts, instead, have taken a holistic view of the investors, the type of business at issue, and the deal struck by the parties. *See, e.g.*, *Long*, 881 F.2d at 134–136; *Howey*, 328 U.S. at 296. These facts, along with others, help the court determine whether the investors had enough experience to intelligently exercise their partnership powers. We note, however, that in at least one other case, we did not require all investors in a partnership to have specialized experience where other evidence showed they could control their investments. *See Williamson*, 645 F.2d at 424–25.

least some investors were not experienced,[25] but not enough to grant summary judgment in the face of the Defendants' competing evidence, especially on "a question of fact which should be resolved in the first instance by the trial court." *Koch*, 928 F.2d at 1479. We, therefore, reverse the district court's decision to grant summary judgment on the second *Williamson* factor.

## C. THE THIRD *WILLIAMSON* FACTOR

The third *Williamson* factor is whether the investors are so "dependent on some unique entrepreneurial or managerial ability of [the Managers] that [they] cannot replace the manager of the enterprise or otherwise exercise meaningful partnership or venture powers." *Williamson*, 645 F.2d at 424. As explained in *Williamson*, this factor looks to the unique capabilities of the manager. If the manager has a "non-replaceable expertise" that drew the investors to the venture, then they might "be left with no meaningful option" other than the manager. *Id.* at 423. For example, investors may be induced to enter a "real estate partnership on the promise that the partnership's manager has some unique understanding of the real estate market in the area in which the partnership is to invest." *Id.* Any right to "replace the manager" would only come at the expense of "forfeiting the management ability on which the success of the venture is dependent." *Id.* Dependence, however, does not extend to the delegation of management duties—"[t]he delegation of rights and duties—standing alone—does not give rise to the sort of dependence on others which underlies the third prong of the *Howey* test." *Id.*

---

[25] This evidence consists mainly of brief statements by investors. One investor said that he did not "understand everything," but the record contains no other information about him. Another investor claimed that she was a "novice investor." Again, the record has no further information about her. Another claimed that he was "new to the oil industry." The record contains no further evidence about him either. Finally, one "inexperienced" investor had over $2,000,000 in assets, was an engineering director, and had an investment advisor. A fact-finder is better suited to weigh the probative value of this evidence.

Here, the SEC argues that the Managers were effectively irreplaceable not because of some special skill, but because they had the sole ability to enforce drilling contracts with the subcontractors and unfettered control over the drilling projects' assets.  According to the CIMs and JVAs, all investor funds would be transferred to one of the Managers, who would then subcontract with other companies, which were identified in the CIMs, to complete the drilling.  According to the SEC, this created two problems.  First, even if the investors removed the Managers, they would still be party to the contracts with the subcontractors, making the investors reliant on them—even if removed, the Managers still had the power to enforce, or not enforce, the drilling contracts.  Second, the Managers controlled all of the investors' funds.  Funds were transferred from the drilling projects into an operating account at Aschere or Arcturus, and investors had no right to the funds.  At least one case held that a manager is effectively irremovable where it controls investors' funds and has the sole ability to recoup them.  *Merch. Capital*, 483 F.3d at 764.

Neither of the SEC's arguments is convincing.  The first argument is unconvincing because the record is not clear enough to say, as a matter of law, that the web of contracts between the projects, Managers, and subcontractors made the Managers irremovable.  Nothing in the record demonstrates that, if Arcturus or Aschere were removed, the drilling projects would be unable to enforce their contracts.  On the contrary, the record suggests that the drilling projects would still have contracts with Aschere and Arcturus, who, in turn, would have enforceable contractual relationships with the subcontractors. Nothing in the record suggests that a new manager could not enforce the contract with Aschere or Arcturus through this relationship.  And if Aschere or Arcturus failed to perform after being paid, the drilling projects would be in the same position as if some other contracting company failed to perform.

No. 17-10503

The state of the record in this case contrasts markedly with *Merchant Capital*—the primary case that the SEC cites for their argument. In *Merchant Capital*, the structure of the contractual relationships was like the structure here. The defendant managers there took funds from multiple investors, pooled them, and then pooled them again. The defendants, on behalf of the partnership, entered into a contract with a service-providing company, New Vision, who then entered into a contract with another company, EAM. Investor funds were pooled by New Vision, and then repooled with other funds by EAM. The ultimate question was whether (1) individual investors could get their funds back from the defendant, or (2) they depended on the defendant to get their funds back.

The court held that the investors depended on the defendant for two reasons. First, the defendant did not have effective contractual rights against the service companies. The defendant had pooled the partnership's funds in accounts "owned by New Vision." *Id.* at 764. And the defendant could not get those funds back except "in limited circumstances, or upon termination of the entire contract." *Id.* Second, even if the investors replaced the defendant with a new manager, the right to demand return of investor funds belonged solely to the defendant, not to the partnership. *Id.* Notably, all of these practical difficulties with removing the defendant were established at trial. Here, though, the SEC merely assumes that the right to enforce the contracts with drilling subcontractors sits solely with the Managers, like in *Merchant Capital*. But no evidence shows that the investors would be unable to enforce a drilling contract if Arcturus or Aschere were removed as the Manager.

While it is true that the Managers made contractual promises to find subcontractors to do the drilling, a mere contractual promise is not enough to find the Managers irreplaceable. In *Williamson*, like here, the manager, Godwin Investments, drafted the relevant venture agreements and promised

35

to perform most of the significant tasks in a real estate venture, like developing the land and rezoning it.  But the court held that these contractual provisions were not enough to satisfy the third *Williamson* factor—more is required to establish irremovability than mere contractual relationships.

> It is true that the Property would ultimately have to be developed or sold, and in the interim managed, before a profit could be returned on it; and it is true that Godwin Investments promised to perform these tasks.  But this alone does not establish a dependence on Godwin Investments so great as to deprive the plaintiffs of their partnership powers.  The plaintiffs must allege that Godwin Investments was uniquely capable of such tasks or that the partners were incapable, within reasonable limits, of finding a replacement manager.  *Godwin Investment's promise must be more than a binding contract enforceable under state law*; it must create the sort of dependence implicit in an investment contract.

*Williamson*, 645 F.2d at 425 (emphasis added).  In short, Aschere and Arcturus are not irreplaceable simply because they made contractual promises to the drilling projects.

The SEC's second argument—the Managers were irremovable because they controlled all of the investors' funds—is unconvincing for two reasons.  First, the investors never expected to recover their funds unless the oil and gas wells became productive.  The investors did not invest in a pool of debt instruments from which they could withdraw their funds, like in *Merchant Capital*.  The investors sunk their capital into an exploratory drilling project knowing that they would not get it back unless the well became productive.  And making the well productive would require further investment.  They essentially bought the right to see if the well might be productive, and, if so, to invest in completing the well.  The investors could not get back their funds because they spent them on an exploratory drilling contract—one phase of the total operation—not because the Managers controlled them.

36

Case: 17-10503     Document: 00515013011     Page: 37     Date Filed: 06/27/2019

Second, the investment here was segmented, as noted above. This case would present a different question if the investors, from the outset, gave all of their funds to the Managers for every phase of the contract—drilling, completion, and subsequent operations—and then the Managers transferred those funds to themselves. In that situation, the Managers might be irreplaceable.

At least one case suggests that locking investors from the outset into turnkey contracts with the manager for each stage of the process might make a manager irreplaceable. *SEC v. Shields* dealt with an almost identical drilling project, but at the motion to dismiss stage. There, the court held that the SEC stated enough facts to satisfy the first *Williamson* factor. *Shields*, 744 F.3d at 645. The first factor was satisfied, even though the investors had the power to remove the manager, because the manager hired itself as the main contractor for the "turnkey drilling *and* completion contracts." *Id.* at 647 (emphasis added). Here, though, the investors were not locked into drilling and completion contracts—they plausibly were able to cut Aschere and Arcturus out of any completion contracts or subsequent operations.

The Defendants put forth enough evidence to raise a genuine issue concerning whether the Managers were effectively irreplaceable. We, therefore, reverse the district court's ruling on the third *Williamson* factor.

### III. CONCLUSION

In sum, the Defendants raised several issues of material fact that the district court failed to consider. For the foregoing reasons, the judgment of the district court is REVERSED and REMANDED for trial.