## IN THE COURT OF APPEALS OF IOWA

No. 21-1022
Filed July 20, 2022

**ANTHONY WEBER and JERROLD ROTHOUSE,**
　　Petitioners-Appellants,

**vs.**

**IOWA INSURANCE DIVISION,**
　　Respondent-Appellee.

_____

　　Appeal from the Iowa District Court for Polk County, Jeanie Vaudt, Judge.


　　Anthony Weber and Jerrold Rothouse appeal the judicial review ruling affirming the decision of the Iowa Insurance Division. **AFFIRMED.**


　　Alexander E. Wonio of Hansen, McClintock & Riley, Des Moines, for appellants.

　　Thomas J. Miller, Attorney General, and Jordan G. Esbrook, Assistant Attorney General, for appellee.


　　Heard by Bower, C.J., and Schumacher and Ahlers, JJ.

**AHLERS, Judge.**

"Blue-sky laws" are statutes designed to protect citizens from fraudulent investment schemes.[1] Typically, they seek to achieve this goal by requiring things like licensing of brokers, registration of securities, and approval of investment offerings by appropriate governmental agencies.[2] Iowa's version of a blue-sky law is Iowa Code chapter 502, the Iowa Uniform Securities Act.[3] The statute makes the Iowa Insurance Division (Division) responsible for enforcing it.[4]

The Division became aware that a Texas company named Carson Energy, Inc., (Carson) had solicited Iowans to invest in Carson's oil and gas wells in Texas and elsewhere. The Division investigated and ended up filing charges against Carson; Carson's sole director and president, Earl Carter Bills II; and two of Carson's salesmen, Anthony Weber and Jerrold Rothouse. After Carson went out of business and Bills died, only Weber and Rothouse remained as parties to answer the Division's charges. Specifically, the Division alleged Weber and Rothouse placed cold calls to Iowans offering to sell "joint venture shares" in Carson's wells. As part of the investment process, Iowans persuaded to invest had to contribute money and sign an Application Agreement, Joint Venture Agreement, and Power of Attorney (collectively "agreement"). The Division alleged the sale of the investments violated Iowa's blue-sky law in two ways. In one count,

---

[1] *Blue-sky law*, Black's Law Dictionary (11th ed. 2019).
[2] *Blue-sky law*, Black's Law Dictionary (11th ed. 2019).
[3] Iowa Code § 502.101 (2015).
[4] *See* Iowa Code §§ 502.601, .602 (spelling out the Division's responsibilities for administering the Iowa Uniform Securities Act).

the Division alleged Weber and Rothouse engaged in the sale of unregistered securities. In a second count, it alleged they committed securities fraud.

As the charges progressed, the Division filed a motion for partial summary judgment on the unregistered-securities count, seeking a declaration that the investments Weber and Rothouse sold qualified as "securities" under Iowa law. Weber and Rothouse did not resist the Division's motion, but they filed a competing motion for summary judgment, contending the investments they sold were not "securities" and asserting other defenses. An administrative law judge (ALJ) determined that, as a matter of law, the investments Weber and Rothouse sold were "securities" and Weber and Rothouse's other asserted defenses did not protect them from liability. Based on these determinations, the ALJ granted the Division's motion and denied Weber and Rothouse's.

The Division then filed a second motion for summary judgment on the unregistered-securities count. Building off the prior determination that the investments were securities, the Division sought a final ruling rejecting Weber and Rothouse's other defenses. The ALJ granted the Division's motion, ultimately concluding that Weber and Rothouse engaged in the sale of unregistered securities. Thus, the only remaining issue as to the unregistered-securities count was to determine the appropriate penalties.

The case proceeded to an evidentiary hearing on the fraud count and the issue of penalties. The hearing included testimony from Weber, Rothouse, and three Iowans who signed agreements and invested in Carson's wells. After the hearing, the ALJ issued a proposed decision in which the ALJ declined to reconsider the earlier grants of summary judgment on the unregistered-securities

count, found the Division failed to prove Weber and Rothouse engaged in securities fraud, and imposed various penalties against Weber and Rothouse, including fines of $6000 against Weber and $9000 against Rothouse for the sale of unregistered securities. The insurance commissioner adopted the ALJ's decision as final agency action. Weber and Rothouse sought judicial review, and the district court affirmed the agency. Weber and Rothouse appeal.

## I.    Standard of Review

> Iowa Code section 17A.19(10) [(2020)] governs judicial review of agency decision making. We will apply the standards of section 17A.19(10) to determine whether we reach the same results as the district court. The district court may grant relief if the agency action has prejudiced the substantial rights of the petitioner, and the agency action meets one of the enumerated criteria contained in section 17A.19(10)(a) through (n).[5]

While the ALJ issued a proposed decision after an evidentiary hearing and performed some fact finding, the parties agree the issue on judicial review was decided by summary judgment. Additionally, neither party asserts the agency's decision is entitled to deference, and both parties agree the same standards applicable to a summary judgment decision of the district court apply to the agency's decision here.[6]

"We review orders granting summary judgment for correction of errors at law."[7] "Summary judgment is appropriate 'if the pleadings, depositions, answers

---

[5] *Evercom Sys., Inc. v. Iowa Utils. Bd.*, 805 N.W.2d 758, 762 (Iowa 2011) (internal citations and quotation marks omitted).
[6] *See* Iowa Admin. Code r. 191-3.15(5) (stating a motion for summary judgment in a Division proceeding "shall comply with the requirements of Iowa Rule of Civil Procedure 1.981 and shall be subject to disposition according to the requirements of that rule").
[7] *Banwart v. 50th St. Sports, L.L.C.*, 910 N.W.2d 540, 544 (Iowa 2018).

to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'"[8] "A genuine issue of fact exists if reasonable minds can differ on how an issue should be resolved."[9] "A fact is material when it might affect the outcome of a lawsuit."[10] "Even if the facts are undisputed, summary judgment is not proper if reasonable minds could draw different inferences from them and thereby reach different conclusions."[11]

## II.  Analysis

The fighting issue on appeal is whether the agency properly determined as a matter of law that the joint-venture shares that Weber and Rothouse sold to Iowans were securities that were required to be registered.  The Division argues the investments are securities.  Weber and Rothouse argue they are not.

### A.  Error Preservation

The Division begins by asserting that Weber and Rothouse failed to preserve error on the issue they raise on appeal because they did not raise the issue to the agency.[12]  The Division points out that Weber and Rothouse never filed a resistance to the Division's first motion for partial summary judgment.  While that is true, Weber and Rothouse did file their own motion for summary judgment

---

[8] *Banwart*, 910 N.W.2d at 544 (quoting Iowa R. Civ. P. 1.981(3)).

[9] *Banwart*, 910 N.W.2d at 544 (quoting *Est. of Gottschalk v. Pomeroy Dev., Inc.*, 893 N.W.2d 579, 584 (Iowa 2017)).

[10] *Banwart*, 910 N.W.2d at 544.

[11] *Banwart*, 910 N.W.2d at 544–45 (quoting *Clinkscales v. Nelson Sec., Inc.*, 697 N.W.2d 836, 841 (Iowa 2005)).

[12] *See Renewable Fuels, Inc. v. Iowa Ins. Comm'r*, 752 N.W.2d 441, 446 (Iowa Ct. App. 2008) ("In cases involving judicial review of final action of an administrative agency, an issue must generally be presented to the agency to satisfy error preservation requirements.").

shortly after the Division filed its motion. In their motion, Weber and Rothouse asserted their defenses to the unregistered-securities charge. In their memorandum of authorities supporting their motion, the duo clearly argued the agreements "are not securities." Their arguments quoted the language of the agreements, and the ALJ's first summary judgment decision considered this language. We find their arguments preserved for our review.

### B.    Securities Under Iowa Law

With certain exceptions not alleged to be applicable here, Iowa Code section 502.301(3) (2015) prohibits a person from selling a security in Iowa unless the security is registered in Iowa.[13]  There is no dispute the agreements were not registered in Iowa. Thus, the issue is whether the agreements qualify as "securities" under Iowa law.

"The term 'security' is broadly defined by statute to include investment contracts."[14]  While a joint-venture interest is ordinarily not an investment contract, "economic reality prevails over form."[15]  Relying on federal law, our supreme court adopted a three-part test to identify an investment contract:

1. An investment of money;
2. In a common enterprise; and
3. On an expectation of profits to be derived solely from the efforts of individuals other than the investor.[16]

---

[13] *See* Iowa Code § 502.301(1)–(2) (providing exceptions to the registration requirement).

[14] *State v. Kraklio*, 560 N.W.2d 16, 18 (Iowa 1997); *accord* Iowa Code § 502.102(28) (defining "security").

[15] *Corp. E. Assocs. v. Meester*, 442 N.W.2d 105, 107 (Iowa 1989).

[16] *Meester*, 442 N.W.2d at 107 (quoting *Sec. & Exch. Comm'n v. W.J. Howey Co.*, 328 U.S. 293, 298–99 (1946)); *see also Kraklio*, 560 N.W.2d at 18 (applying the same factors).

This test "is flexible, rather than static, 'to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits.'"[17]  The supreme court returned to relying on federal law for additional guidance on the third prong:

> All of this indicates that an investor who claims his general partnership or joint venture interest is an investment contract has a difficult burden to overcome.  On the face of a partnership agreement, the investor retains substantial control over his investment and an ability to protect himself from the managing partner or hired manager.  Such an investor must demonstrate that, in spite of the partnership form which the investment took, he was so dependent on the promoter or on a third party that he was in fact unable to exercise meaningful partnership powers.  A general partnership or joint venture interest can be designated a security if the investor can establish, for example, that (1) an agreement among the parties leaves so little power in the hands of the partner or venturer that the arrangement in fact distributes power as would a limited partnership; or (2) the partner or venturer is so inexperienced and unknowledgeable in business affairs that he is incapable of intelligently exercising his partnership or venture powers; or (3) the partner or venturer is so dependent on some unique entrepreneurial or managerial ability of the promoter or manager that he cannot replace the manager of the enterprise or otherwise exercise meaningful partnership or venture powers.[18]

Before turning to the merits of the parties' arguments, we first want to clarify the record we are considering.  As noted, the administrative proceeding included an evidentiary hearing after the ALJ granted summary judgment finding that the agreements were securities.  Weber and Rothouse do not ask us to consider any testimony or exhibits produced during the hearing.  Therefore, we limit our analysis to the evidence in the record at the time of the first partial summary judgment decision, when the ALJ found the agreements were securities.

---

[17] *Kraklio*, 560 N.W.2d at 18 (quoting *Howey*, 328 U.S. at 299).
[18] *Meester*, 442 N.W.2d at 107 (quoting *Williamson v. Tucker*, 645 F.2d 404, 424 (5th Cir. 1981)).

We now turn to the merits. In support of their claim that the investments they sold were not investment contracts, Weber and Rothouse point to language in the agreements requiring active participation by and representing investment expertise of the investors. Specifically, the Application Agreement contains several statements whereby the signors represent they will actively participate in the well projects and they have investing expertise:

> Participants in this Joint Venture are provided extensive and significant management powers. Participants are and will be expected to exercise such powers and are prohibited from relying on the Managing Venturer[19] for the success or profitability of the Joint Venture.
> . . . .
> . . . . Applicant understands the information set forth below is merely a summary and, therefore, may not include all of the information that Applicant might deem material to his (her) decision to participate in the joint Venture. Applicant is encouraged to review additional information . . . . Applicant agrees that Applicant will rely solely on his (her) own inquiry in formulating his (her) ultimate decision as to whether or not to participate in the Joint Venture.
> . . . .
> As a condition to being admitted to the Joint Venture, Venturers must be prepared to actively participate in, the management of the Joint Venture and must possess extensive experience and knowledge in business affairs such that they are capable of intelligently exercising their management powers as a Joint Venturer. . . . Additionally, as a condition to participation in the Joint Venture, Venturers must rely on their own business judgment and not on any unique entrepreneurial or managerial ability of Carson for the success of the Joint Venture due to their ability to (i) exercise their meaningful Joint Venture powers; and (ii) replace the Managing Venturer . . . .
> . . . .
> Applicant warrants and represents, prior to making a decision whether to participate in the Joint Venture, he (she) will conduct a personal investigation and will research and consider all factors that bear on the advisability of participating in the Venture, and his (her) decision will not be based solely upon the representations of the Managing Venturer or its affiliates or representative.

---

[19] The Application Agreement designates Carson as the proposed Managing Venturer.

. . . .

      Applicant is experienced in business matters and has sufficient business acumen to analyze and evaluate the merits and risks of participating in the Joint Venture. The undersigned acknowledges and understands participation in the Joint Venture is not intended nor considered by the Managing Venturer to be "securities" as that term is used in state and federal securities regulation . . . . Accordingly, the Applicant warrants and represents that he (she) possesses extensive experience and knowledge in business affairs such that he (she) is capable of intelligently exercising his (her) management powers as a Joint Venturer. In addition, the undersigned warrants and represents he (she) is not relying on the unique entrepreneurial or managerial ability of Carson for the success of the Joint Venture, and his (her) experience and knowledge in business affairs enable him (her) to replace Carson as Managing Venturer and otherwise exercise meaningful joint venture powers.

Despite the application's broad language about investors exercising partnership powers, the Joint Venture Agreement limits the powers available to the investors. The Joint Venture Agreement places day-to-day control with the Managing Venturer. The investors' primary power appears to be removal of the Managing Venturer, though they also had other voting powers.

Regardless of the powers described in the agreements, the key consideration is whether the investors were so reliant on Carson that they were "in fact unable to exercise meaningful partnership powers."[20] Here, there is no evidence any investor exercised any partnership powers. The Division submitted affidavits from fourteen Iowans who signed the agreements and sent money to Carson. While the affidavits are terse and similarly worded, all fourteen Iowans

---

[20] *Meester*, 442 N.W.2d at 107 (quoting *Williamson*, 645 F.2d at 424); *accord Sec. & Exch. Comm'n v. Arcturus Corp.*, 928 F.3d 400, 413 (5th Cir. 2019) ("[F]ormal powers are not dispositive—courts must determine whether investors can and do exercise those powers.").

stated their sole involvement with Carson's well projects was to send money to Carson.

Weber and Rothouse submitted their own affidavits. However, these affidavits focus on defenses the duo asserted before the agency that differ from the defense they raise on appeal. The affidavits focused on defenses that the duo had no authority to register the investments and they did not know the investments needed to be registered. The duo has not raised an issue related to those defenses on appeal; rather, they limit their defense to arguing that the investments were not securities. However, the affidavits they submitted as part of the dueling summary judgment process do not address this defense, as the affidavits do not touch on the investors' participation in Carson's well projects or their investment expertise. Instead, they emphasize that the duo's involvement was limited to making cold calls for Carson and they had no knowledge of any need to register the agreements as securities or authority to do so.

Weber and Rothouse compare their claims to those in *Securities & Exchange Commission v. Arcturus Corp.*, 928 F.3d 400 (5th Cir. 2019), wherein the Fifth Circuit found genuine issues of material fact precluding summary judgment as to whether "joint ventures" for oil and gas wells were actually securities.[21] We find *Arcturus* unpersuasive because several factors present in that case are absent here. Again, there is no evidence the investors here exercised their formal partnership powers.[22] There is no indication the investors

---

[21] *Arcturus*, 928 F.3d at 424.
[22] *Cf. Arcturus*, 928 F.3d at 413 (noting "the record suggests that the investors utilized their powers").

had any source of information other than Carson.[23]  There is no indication the investors knew each other or ever communicated with each other.[24]  Carson attracted the Iowa investors by placing cold calls,[25] and thirteen of the fourteen Iowa investors stated they had no experience or expertise in the oil and gas industry[26] with no indication any third-party assisted the Iowans with the Carson projects.[27]  Given these differences in the cases, we come to a different conclusion than that reached in *Arcturus*.

During oral argument, Weber and Rothouse's counsel used a tennis analogy.  Counsel argued that the Division, as the party moving for summary judgment, had the obligation to get the serve in by showing there is no genuine issue of material fact before the duo had the obligation to return the serve by presenting evidence that generates a fact question.

In support of its claim that the Division did not get the serve in, Weber and Rothouse point to the principle that the factfinder is not required to accept the investors' affidavits as true.[28]  They argue that, in light of the representations of investor savvy and involvement contained in the agreements, all the Division did

---

[23] *Cf. Arcturus*, 928 F.3d at 415 ("The record suggests that investors had numerous sources of information.").
[24] *Cf. Arcturus*, 928 F.3d at 416–17 ("The record shows that the investors did in fact communicate with each other. . . .  The record also shows documents in which the Managers identified the other investors.").
[25] *See Arcturus*, 928 F.3d at 418 ("The cold-calling campaign is probative of the investors' experience.").
[26] *Cf. Arcturus*, 928 F.3d at 419 ("[M]any investors did, in fact, have experience in oil and gas drilling.").
[27] *Cf. Arcturus*, 928 F.3d at 419 ("The record also shows that various investors had advisors helping them make decisions . . . .").
[28] *See Banwart*, 910 N.W.2d at 551 (in denying summary judgment, noting the factfinder "is free to disbelieve" the witness).

by presenting the investors' affidavits was to generate a fact question. Therefore, according to the duo, the Division did not get the serve in and the duo had no obligation to return it by pointing to conflicting evidence.

We disagree with the duo's claim. Even though the agreements make representations about the investors' business savvy and outline some powers available to the investors, the key question is whether the investors actually had that savvy and were effectively able to wield those powers.[29] The Division's affidavits show that the investors had little to no experience with oil and gas wells and were not able to use the powers stated in the agreements. In other words, the factual assertions in the Division's motion, supported by affidavits, were that the reality of the investment differed from the representations in the agreements.

Faced with the factual assertions alleging that the reality of the investment was different from that claimed in the agreement, the duo's mere reliance on the terms of the agreements was not enough. A party resisting a motion for summary judgment cannot "rest upon the mere allegations or denials in the pleadings,"[30] but must point to competing facts by use of pleadings, depositions, answers to interrogatories, admissions on file, or affidavits.[31] Weber and Rothouse introduced

---

[29] *See Meester*, 442 N.W.2d at 107.

[30] Iowa R. Civ. P. 1.981(5).

[31] *See* Iowa R. Civ. P. 1.981(5) ("When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials in the pleadings, but the response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial."); *see also* Iowa R. Civ. P. 1.981(3) ("The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.").

no evidence contradicting the Division's claims about the realities of this investment. Instead, they made legal arguments that the agreements were not securities, focusing their factual arguments on other defenses. Even on appeal, Weber and Rothouse merely dispute the credibility of the affidavits without pointing to any evidence that contradicts the affidavits.

Based on the record here, we agree there is no genuine issue of material fact that the agreements are securities. To put it in terms of the duo's analogy, the Division got its serve in by asserting facts that established that the reality of the investments differed from the representations in the agreements in that the investors were not experienced with oil and gas wells and had no effective ability to actively participate in the investment. Weber and Rothouse failed to return the serve by presenting conflicting evidence to generate a fact question. So, the point goes to the Division. In this case, it happens to be match point.

**III.    Conclusion**

We find no genuine issue of material fact that the agreements Weber and Rothouse offered to Iowan investors were securities and they were not registered as required by Iowa law. Therefore, we affirm the district court's ruling affirming the Division's decision.

**AFFIRMED.**